[No. 4116.   Decided April 9, 1902.]

CITY OF TACOMA, *Respondent,* v. TACOMA CEMETERY, *Appellant.*

CHARITABLE TRUSTS — CEMETERY — POWER OF TRUSTEES TO SELL.

Where a donor deeds lands for cemetery purposes to a board of trustees who had been selected for that purpose by town trustees, to take title in behalf of the town in the name of such board and to perfect their organization for the management of the cemetery grounds as they deem best, the conveyance reciting that the grantee should be such board, "their successors and assigns," there is implied authority in the deed for such trustees to sell portions of the land and apply the proceeds to the betterment of the remainder for the purposes of the original grant, and its terms negative the presumption of any intention to require that the whole tract should be retained in specie.

SAME — EXECUTION OF TRUST — PRESUMPTION FROM ACQUIESCENCE.

Where portions of a tract donated for charitable purposes were alienated by the trustees about two years after the conveyance of the land to them, and such alienation silently acquiesced in for a period of fourteen years by all parties interested in the trust, the presumption is that such manner of executing the trust was confirmed thereby, when it appears that the sales were made in good faith, and the proceeds were used in carrying on the trust, apparently for the benefit of the trust.

Appeal from Superior Court, Pierce County.—Hon. THAD HUSTON, Judge.   Affirmed.

*Reid & Meade,* for appellant.

*William P. Reynolds* and *Emmett N. Parker,* for respondent.

The opinion of the court was delivered by

WHITE, J.—Respondent brought suit against appellant to recover possession of certain lands.   By its first cause of action it sought to recover a certain strip of land, and by its second cause of action sought to recover pos-

session of certain streets and alleys. Appellant answered each cause of action, denying certain allegations, and pleading to each cause a separate answer. These separate answers were, in effect, a recital of the history of the title of the land in dispute. Respondent, by its first cause of action, sought only to recover a very narrow strip of land. Appellant, by its separate answer to said first cause of action, alleged that respondent claimed not only this narrow strip, but considerable adjacent land, under the same deeds. As it was the mutual desire of counsel to have this additional land brought into the controversy, no objection was made to this manner of pleading. Respondent replied to the separate answers. Trial was had before the court without a jury, a jury being waived, and the court made and filed its findings of fact and conclusions of law. There is no question over the facts found by the court. The court found that the appellant had no estate or interest in the land in controversy. Appellant duly excepted to the court's conclusions of law from the facts found. Judgment was rendered in favor of the respondent. From this judgment the appeal is taken.

The facts, in substance, are: The respondent is a municipal corporation, the successor of the Town of New Tacoma, a municipal corporation, which was in existence prior to 1881. The Town of New Tacoma in 1881 was using part of the land in controversy for burial purposes. The board of trustees of New Tacoma in October, 1881, by resolution entered on their minutes, appointed J. A. Banfield, J. H. Houghton, and B. Barlow to act as the board of trustees of the New Tacoma Cemetery, with full power, as such board, to acquire title to land to be donated by the Tacoma Land Company to the town of New Tacoma for cemetery purposes, and to perfect their organ-

ization for the management of the cemetery grounds as they deemed best. On the 10th of May, 1882, the Tacoma Land Company executed and delivered to Banfield, Houghton, and Barlow the following deed:

"The Tacoma Land Company, a corporation, to John A. Banfield, Joseph H. Houghton and Byron Barlow, all of Tacoma, Washington Territory, The Board of Trustees of the New Tacoma Cemetery.

"Whereas the party of the first part desires to convey to the town of New Tacoma the real estate hereinafter described for a cemetery; and

"Whereas the board of trustees of the said Town of New Tacoma by resolution duly passed on the 19th day of October, A. D. 1881, and entered in its records did designate and appoint the said John A. Banfield, Joseph H. Houghton and Byron Barlow to act as the board of trustees of the New Tacoma Cemetery, with full power as such board to acquire title to the land donated by the Tacoma Land Company to the Town of New Tacoma, for cemetery purposes, and also to perfect such organization for the management of said cemetery grounds as they deemed best;

"Now this indenture witnesseth that by reason of the premises and for and in consideration of one dollar to it paid, the receipt whereof is hereby acknowledged, the said party of the first part does grant, bargain, sell and convey, and covenant to warrant and defend unto the said The Board of Trustees of the New Tacoma Cemetery above named, party of the second part, their successors and *assigns,* the following described real estate situate in Pierce county, Washington Territory, viz., Lots number one (1) and the northeast quarter of the northwest quarter of section 19, in township 20 north, of range 3 east of the Willamette Meridian, containing according to the United States survey seventy-one acres and twenty-four hundredths of an acre more or less. In witness whereof," etc.

On the 15th of July, 1884, Banfield, Houghton, and Barlow associated with themselves George E. Atkinson and Stuart Rice for the purpose of more effectually exe-

cuting their trust.  They formed a corporation under the laws of the territory of Washington, under the corporate name of Tacoma Cemetery.  The last corporation is the appellant.  On the 16th of July, 1884, the city council of the city of Tacoma confirmed the action of Banfield, Houghton, and Barlow in forming the Tacoma Cemetery, and directed said trustees to convey to the Tacoma Cemetery the land conveyed to said trustees by the Tacoma Land Company.  The said trustees on July 30, 1884, executed and delivered to said Tacoma Cemetery a deed for said land, reciting in the deed that the same was made under the resolution of the city council of the city of Tacoma, directing them "to convey to the said Tacoma Cemetery, for the purpose of carrying into effect the intention of the donor, the Tacoma Land Company, and to secure to the citizens of Tacoma the full benefit of said grant of land for cemetery purposes."  On the 19th of September, 1884, and on the 7th of March, 1885, the Tacoma Cemetery conveyed to the Tacoma Light & Water Company, a corporation engaged in the business of conveying water to the city of Tacoma and its inhabitants, 12.15 acres of said land.  The said deed of September 19th conveyed 5.79 acres; the same being part of the 12.15 acres described in the deed of March 7, 1885.  In 1884, after the making of the deed of September 19, 1884, the Tacoma Cemetery and the Tacoma Light & Water Company constructed a substantial fence dividing the land conveyed to the Tacoma Light & Water Company from the land retained by the Tacoma Cemetery, and the fence remained continuously until the year 1898.  In the year 1884 the Tacoma Light & Water Company went into actual physical occupancy and possession of a strip of the land so conveyed to it, and so continued until the 22d of June, 1893.  This strip was about 66 feet wide, and was

16—28 WASH.

used as a way for its water flume. On the last date the
Tacoma Light & Water Company conveyed the land de-
scribed in its two deeds to the city of Tacoma, and the city
of Tacoma went into possession of said strip, and retained
possession until 1898, and has continued in open and no-
torious possession of part of said strip ever since it was con-
veyed to it. No part of the land described in the deed
from the Tacoma Light & Water Company to the city of
Tacoma was at any time between September 19, 1884, and
the month of                    , 1898, in the actual oc-
cupancy of any person other than the said light and water
company and its grantee, the city of Tacoma. The part
of the land not occupied by the water flume was unused
and unoccupied, and not in the possession of any one,
save as the same might be construed to be in possession of
the light and water company and the city of Tacoma un-
der their respective deeds. All taxes on the land conveyed
to the light and water company were paid by it up until the
time of the conveyance to the city of Tacoma. The Ta-
coma Cemetery in 1898 entered into and upon a large part
of said land, being that lying east of a line parallel to and
about six feet easterly from, the water flume conveyed by
the light and water company to the city of Tacoma, and
ousted and ejected the city of Tacoma therefrom. On the
19th of September, 1884, the Tacoma Cemetery conveyed
to the Tacoma Park Association 11 acres, part of the land
described in the deed of the Tacoma Land Company.
This 11 acres in February, 1888, was conveyed by the
park association to J. D. Caughran; also in 1890 the same
tract was conveyed by quitclaim deed by said park asso-
ciation to the said J. D. Caughran. In 1889 Caughran
and his wife platted into town lots, streets, and alleys
said 11 acres, and called it "South Park Addition to Ta-
coma, Washington Territory." The streets and alleys in

this addition were dedicated to the public use. On September 8, 1890, the Tacoma Cemetery executed a quitclaim deed to the Tacoma Park Association for said 11 acres. In 1884 the Tacoma Park Association under the deed of September 19, 1884, went into possession of said 11 acres, and inclosed the whole thereof with a substantial fence, and continuously thereafter remained in actual, open, and notorious possession until the same was conveyed to Caughran, in 1888; and, until the same was platted by Caughran, no one save the Tacoma Park Association and Caughran has been in possession of said 11 acres. From the 14th of March, 1889, when the land was platted, up, to the 1st of July, 1898, all the streets and alleys in the plat were free to public use, and were not in the possession of any one other than the city of Tacoma and the public. In 1898 the Tacoma Cemetery entered into the land covered by the streets and alleys in said plat, and ousted and ejected the city of Tacoma therefrom. All of the land described in the deed from the Tacoma Land Company for more than nine years last past has been within the corporate limits of the city of Tacoma. The deeds to the light and water company and to the park association were made for a fair consideration in money, equal in amount to the full and fair market value of the land at the time the deeds were made; and this money was paid to the Tacoma Cemetery, and by it used and expended in caring for and beautifying the grounds of said cemetery, and for other proper expenses incident to the proper management of the cemetery. The deed to the water company conveyed a strip off the west end, and the deed to the park association a strip off the east end, of the entire tract conveyed by the Tacoma Land Company. The statute under which this action is waged (§5508, Bal. Code) provides that the superior title, whether legal or equitable, shall

prevail. Counsel for the appellant have at length, and with much learning and ability, gone into the question of charitable trusts, for the purpose of showing that the conveyance from the Tacoma Land Company created such a trust.. It must be conceded that the trust created was a charitable one, and that the beneficiaries of such trust were the people of the town of New Tacoma and of the city of Tacoma. The deed from the Tacoma Land Company alone expresses, so far as appears from the record, the intention of the donor. When the deed was executed, the donor knew that the trustees selected by the town of New Tacoma to accept its gift were clothed with power to manage the cemetery grounds as they deemed best. Knowing that the trustees possessed this power of management, the donor conveyed to them the 71 acres of land "for a cemetery," "for cemetery purposes;" granting the land to "the board of trustees of New Tacoma Cemetery, their successors and *assigns.*" We do not think it follows that, because the donation was for cemetery purposes, all of the land was conclusively to be used in specie for the burial of the dead. The trustees and their successors were to have the management of the cemetery grounds as they deemed best. Some portion of the land might have been unfit for the burial of the dead. We know from common observation that it is not every tract of land that is fit for such a purpose. In this 71 acres the portion sold may have been low lands, or otherwise unfit for the final sepulture of the dead. Were the trustees to keep this in specie? We think not. It would still be a gift for cemetery purposes if the unfit portions were sold and the proceeds applied in beautifying the remainder. In the course of time, in a growing city like the city of Tacoma, it might all become unfit for cemetery purposes, and the pub-

lic health might require the removal of those buried. This was a contingency reasonably to be expected. Hence the donor inserted in the deed power to sell when he declared the grant to be to the trustees, their successors and assigns. We think this is the reasonable construction to be put upon the original deed. The granting clause of this deed is free from ambiguity and unattended by conditions or limitations. There is nothing in this deed amounting to a covenant that the grantee should use all the land in specie. The deed was made in pursuance of a resolution giving the management of the cemetery to the trustees as they deemed best. The term "managment," as used here, should not be construed in a restricted sense. The trustees were, in effect, the board of managers. They were to administer, guide, and control the cemetery as they deemed best for cemetery purposes. The deeds to the light and water company and to the park association were made for a money consideration equal in amount to the value of the land conveyed, and the proceeds were used in caring for and beautifying the remainder of the land which was in use for cemetery purposes, and in paying other expenses incident to the proper management of the cemetery. It seems to us that the donor's gift has been applied as intended. There has been no substantial abuse or misuser of the property, amounting to a perversion of the charity. There is nothing in the record tending to show that the charity, in its main object and scope, was weakened or defeated by the sale of the two tracts. As was said by Justice AGNEW, of the supreme court of Pennsylvania: "A sale is frequently the best mode of executing the trust" as to part of the property, and sometimes as to the whole of it. *In re Mercer Home for Disabled Clergymen,* 162 Pa. St. 232 (29 Atl. 731). The case cited was somewhat similar to the one under consideration. The donor devised a farm

as a home for disabled ministers, and expressly provided that no part of it should be sold or disposed of. The farm contained 185 acres. Two parcels containing 26 acres were separated by a highway from the main farm. The 26 acres, without the expenditure of a considerable sum for improvements and repairs, were incapable of producing an income corresponding in value to what it could be sold for. The court authorized the sale, and the use of the purchase price for the benefit of the charity.

What we have heretofore said is upon the theory that the want of power to sell cannot be clearly drawn from the original deed of the donor, and that there was implied authority conferred by the deed on the trustees to sell for cemetery purposes.

"A trustee is seldom justified in selling the trust estate without an express or implied authority conferred upon him by the instrument of trust. If no power of sale is contained in the instrument, courts of equity, upon cause shown, may decree a sale." 2 Perry, Trusts, §764.

This can be done by a court of equity, even if the donor expressly and clearly intends to have the land conveyed used in specie. *Stanley v. Colt,* 5 Wall. 119; *Alemany v. Wensinger,* 40 Cal. 288; *Weeks v. Hobson,* 150 Mass. 377 (23 N. E. 215; 6 L. R. A. 147); *In re Mercer Home, supra.*

"As a general rule trustees of charities should never alienate the trust estate without the sanction of the court. It does not necessarily follow that such alienation will be treated *per se* as a breach of trust." Hill, Trustees, p. 463.

The trustee may do at his own risk what the court would have done under similar circumstances. Lord LANGDALE, defining the power and duty of a trustee of a charity, says:

"It is plain that, in ordinary cases, a most important part of their duty is to preserve the property, but it may happen that the purposes of the charity may be best sustained and promoted by alienating the specific property. The law has not forbidden the alienation, and this court, upon various occasions, with a view to promote the permanent interests of charities, has not thought it necessary to preserve the property in specie, but has sanctioned its alienation."

And after remarking that the trustees may do at their own risk what the court would have done under the circumstances, and deeming the alienation made by the trustees, on the whole, beneficial, he dismissed the bill, which was to avoid a lease made by the trustees for ninety-nine years. *Attorney General v. South Sea Co.*, 4 Beav. 453; *Newark v. Stockton*, 44 N. J. Eq. 179 (14 Atl. 630).

We think that the position assumed by the appellant, that the Tacoma Cemetery is trustee, and the people of the city of Tacoma the *cestuis que trustent* is correct. The city of Tacoma, in its corporate capacity, stands as an entire stranger to the trust, so far as having any duties or obligations as to its management. The city's title, therefore, is the same as any stranger's title would be, acquired in the same manner or under the same circumstances. All parties interested in this trust (the donor, the people of the city of Tacoma, the Tacoma Cemetery, and the original trustees, and the state of Washington, possessing sole visitorial power) have, at least by silent acquiescence covering a period of about fourteen years (longer than the period fixed by the statute of limitations for the recovery of real property), construed the original deed from the Tacoma Land Company as vesting the power in the trustees to convey, or have sanctioned by this silence the conveyance as made, thereby confirming the manner of ex-

ecuting the trust. In view of the fact that the sales were made in good faith, and apparently were for the benefit of the trust, and the proceeds of the sales were used in carrying on the trust, and there being no showing to the contrary, every presumption should be in favor of the sales, and that a court of equity would have decreed the same on application of the trustee, especially at this distance of time, with the silence of all concerned for so many years. The presumption is that the trustee has faithfully discharged its duty as it understood it, and he who would build a right upon a breach of duty must aver facts countervailing this presumption. *Richmond v. Davis,* 103 Ind. 449 (3 N. E. 130). The case should now be viewed as if facts were then sufficient to induce a court of equity to direct the sale as made. In the case of *Newark v. Stockton, supra,* involving an attempt to enjoin a sale by a trustee of charity, it is said at page 192:

"It seems to us plain, that, under the conditions presented, the chancellor, if he had been properly applied to, would have been bound to permit the designed transmutation of this property. And if this be so, then the injunction should not have been issued, for the court will not enjoin the act of a trustee of a charitable use which itself would have directed to be done, had the case been before it. Such a trustee may alienate the trust property, but he will do such act at the peril of his conduct being disapproved of by the court of chancery."

In the case of *Richmond v. Davis, supra,* the court held to the presumption that the trustee, in making a perpetual lease, was warranted in doing so by the necessities of the case, and that it was to the interest of the trust. Assuming the lease to be valid, which the court did in that case, it was as effectual to forever deprive the trustee of all control of the land as a deed. The supreme court of Massachusetts says:

"The length of time for which a court of chancery will require the trustee of a charity to account for income which has not been applied according to the intentions of the donors is much affected by the particular circumstances of each case. An arrangement made in good faith and acted upon for many years will not be lightly disturbed. But the statute of limitations affords no absolute bar or limit; and when trustees, with knowledge of the charitable use, and no reasonable excuse for mistake, have misappropriated the whole or part of the income, they will be held to account for it during the whole period of misappropriation, unless grave inconvenience or hardship would be caused by doing so." *Attorney General v. Old South Society*, 13 Allen, 474, 495.

We think the principles here announced are applicable to this case. It is said in 2 Perry, Trusts, § 745:

"  .  .  .  nor will lapse of time be allowed to establish any perversion or abuse of a charitable trust, *if the original purpose can be clearly determined.* But great lapse of time is frequently a controlling element in disposing of charity suits; for if a charity has been administered for a long time without question, the court will not interfere to change it without conclusive evidence that the charity has been perverted. A continued use, with the assent of all parties, for a great length of time, must have an influence in the construction of all written instruments, especially if there is any doubt as to their true meaning. If such use was contemporaneous with the foundation, and has continued uninterrupted and uncorrected for a great length of time, where there was opportunity for complaint and correction, the arrangement will not be disturbed."

Looking to the grant of the founder of this trust we have, to say the least, a very doubtful restriction upon the trustee's power of alienation. We have the fact that the proceeds of the sale were fair and just in amount, and

were honestly expended in the furtherance of the object
of the trust; that this expenditure actually resulted to the
benefit of the trust; and that the gift for charitable pur-
poses, in the main object and scope, was not weakened or
destroyed. We have the possession of the land conveyed,
surrendered by the trustee and its grantees, not only con-
structive, but physical, defined by fences which it assisted
in building, and which possession continued uninter-
rupted for nearly fourteen years. We have the silent ac-
quiescence in all these things, covering the period of
fourteen years, on the part of all persons interested, in-
cluding the visitorial power. We think it would be ineq-
uitable, under these circumstances, to hold the sales made
by the trustees void.

The judgment of the court below should be, and the
same is, therefore, affirmed.

REAVIS, C. J. and HADLEY, FULLERTON, MOUNT and
DUNBAR, JJ., concur.