SLADE v. GAMMILL.

5-944                                                289 S. W. 2d 176

Opinion delivered April 16, 1956.

*Crumpler & O'Connor, J. Hugh Wharton* and *Jabe Hoggard,* for appellant.

*Henry S. Yocum, J. R. Wilson, T. O. Abbott, Surrey E. Gilliam,* and *Bolivar L. Allen,* for appellee.

ED F. MCFADDIN, Associate Justice. This suit involves a portion of an old cemetery in El Dorado. In effect, it is a three-cornered lawsuit between (a) Trustees of the First Methodist Church of El Dorado (hereinafter called "Church"); (b) Trustees of Warner Brown Cemetery (hereinafter called "Cemetery Trustees"); and (c) certain heirs of Warner Brown, hereinafter named. The Church brought the suit against the Cemetery Trustees and Warner Brown heirs as a class, and prayed that the title of the Church be quieted to a strip of land that had formerly been a portion of the Warner Brown Cemetery. From a decree awarding the Church

the prayed relief, certain Warner Brown heirs have appealed. The appellants here are Joe Slade, Pattie Goodwin Wharton, Nell Goodwin Smith and Lena Goodwin Trimble.

In 1848 Warner Brown, a citizen of the then recently incorporated Town of El Dorado, deeded certain property to the Methodist Church and deeded adjoining property to three Trustees of the Warner Brown Cemetery. Two of these Trustees were Peter D. Goodwin and John H. Askew. The name of the third Trustee has been forgotten. Unfortunately the deed from Warner Brown to the three Trustees was never placed of record and its contents are necessarily left to the recollection of the witnesses. Warner Brown died in 1853, and his grave is in the Cemetery. At all events, the parcel of land became a cemetery and burials in it continued to be made at irregular intervals until 1938. Whether it was originally intended as a public cemetery is not known: there is no record of any lots being sold, but over the years it was used by people of various religious affiliations, and by those in no wise related to Warner Brown; so it may be conceded that the public nature of the cemetery has been established (see 10 Am. Jur. 489).

In 1892 the original Cemetery Trustees had died without naming any successors; and seven persons, representing themselves to be some of the lineal descendants of Warner Brown, executed and recorded an instrument naming William W. Brown, J. S. Frost and Hugo W. Goodwin to be the Trustees of the Warner Brown Cemetery, and providing that the survivors of the said three Trustees should have power to select successor Trustees[1]. In 1930 William W. Brown, as the sole

---

[1] This instrument, omitting only signatures, reads as follows: "Know Ye That we lineal descendants of Warner Brown have met in an informal family meeting to consider and give shape to a revival of Trusteeship to a certain Cemetery lot situated in the Town of El Dorado, Ark. The original Trustees, viz: Peter D. Goodwin, John H. Askew and _____ _____ having died without any revival of other Trustees for said Lot and as we can find no record of the work & management of said Trustees but only know that the said Warner Brown, appointed them about the year 1848 to act for the Heirs and descendants of himself, in controlling said lot to be kept and used for a burial place for him & them forever. Knowing these facts we undertake to and hereby revive the Trusteeship by appointing William W. Brown,

survivor of the 1892 Trustees, appointed Thomas Goodwin and W. W. Brown, Jr. to act with him as Trustees. In 1952, W. W. Brown, Jr., being the sole survivor of the 1930 Trustees, named Alta Goodwin and Dan Lee Staples to act with him as Trustees; and these three are the presently acting Trustees of the Warner Brown Cemetery named in this suit.

In 1954 the said Trustees realized (a) that burials had ceased in the cemetery since 1938; (b) that the cemetery was without any money for maintenance; (c) that the monuments over the graves were falling down; and (d) that some effort should be made to obtain perpetual care. Thereupon the Cemetery Trustees made a contract with the First Methodist Church of El Dorado, which needed land on which to erect an educational building. The contract was that the Trustees of the Warner Brown Cemetery conveyed to the Church the West 86 feet of the cemetery property and, in return, the Church agreed, *inter alia,* (a) to construct and maintain a steel fence at least six feet high on all sides of the cemetery not enclosed by a brick wall; (b) to move all bodies from the 86-foot strip into the other portion of the cemetery; (c) to erect a suitable monument in the cemetery to the memory of Warner Brown; (d) to erect a plaque designating the cemetery as the "Warner Brown Cemetery";

J. S. Frost and Hugh W. Goodwin as Trustees to assume and take control of said lot. It being all of Lot No. 21 Town Plat of the Town of El Dorado, except that part sold to the Trustees of the Methodist Episcopal Church South see Record Book E, p. 424. And our desire and wish is that the Trustees for Warner Brown Heirs act in concert with the Trustees of the M. E. Church South acting for the Church situated on said Lot in improving, fencing and beautifying said cemetery & church lot and such other matter as may insure to the benefit of both sets of Trustees and as others not heirs of Warner Brown have been permitted to bury their friends on said lot we direct and request that the Trustees herein appointed recognize and make good such permits and if they see proper to grant or sell other like privileges, the proceeds to be kept in trust for repairs of said grounds or to the erection of a suitable mark at the grave of the Donor Warner Brown or both & should either of the Trustees mentioned herein refuse to act, or die, to perpetuate a Trusteeship to said Cemetery property it shall be the duty of the other two to select some one to act as Trustee and in this manner keep up the full corps of Trustees for all time and to the end that all may know the situation of this property we recommend that the trustees have this placed upon the Record of Deeds in the County Clerk's Office and also made of record in the books of minutes kept by Trustees of the M. E. Church situated on part of said lot."

(e) to have the cemetery suitably landscaped; and (f) to provide it with continuous care[2].

After the contract was made and the deed delivered and all the graves moved from the 86-foot strip and, just as the Church was about to commence the erection of a $400,000.00 educational building on the 86-foot strip, some question arose as to the validity of the conveyance by the Cemetery Trustees to the Church. Thereupon, the Church brought this suit, which resulted in the decree previously mentioned. The appellants here are some of the named heirs of Warner Brown resisting the suit. They were sued as representatives of all of the other heirs of Warner Brown; and on appeal they make the three points now to be stated.

I. The appellants say: *"This is not the character of action contemplated by Section 27-809 Ark. Stats., and therefore plaintiffs were not entitled to maintain the same as a class action."* Section 27-809 Ark. Stats. reads:

"Where the question is one of a common or general interest of many persons, or where the parties are numerous, and it is impracticable to bring all before the Court within a reasonable time, one or more may sue or defend for the benefit of all."

Our Statute is a recognition of the equity idea of class representation and we have a number of cases bearing on the matter of class representation. A few of them are: *Connor* v. *Thornton,* 207 Ark. 1113, 184 S. W. 2d 589; and *Holthoff* v. *State Bank,* 208 Ark. 307, 186 S. W. 2d 162. Appellants rely on the case of *Hunt* v. *McWilliams,* 218 Ark. 922, 240 S. W. 2d 865, rather than the cases on class representation. We hold that the case at bar affords a classic example of the application of our Statute on class representation. Here the evidence showed that no one was able to name all of the heirs of Warner Brown. One of his descendants, who was a witness in this case, was Walter W. Brown, Jr. He testi-

---

[2] The records in the office of the State Board of Health do not list the Warner Brown Cemetery as registered in keeping with § 82-402 Ark. Stats.

fied that Warner Brown died intestate on December 3, 1853, having been married three times and having been the father of twenty-six children; that descendants of Warner Brown had been located in nearly every State in the Union; and that it was impossible to determine the names and addresses of the many heirs of Warner Brown.

Mr. Joe K. Mahoney testified that he had lived in Union County for more than seventy years and had practiced law in El Dorado for many years; that some of his ancestors were buried in the Warner Brown Cemetery; and that he had occasion in his practice to attempt to determine the heirs of Warner Brown. Mr. Mahoney said that he did not know any person who could make an affidavit as to who were all the heirs of Warner Brown; and that they were literally scattered to the four corners of the world.

Under these facts, we think that a sufficient showing was made for the application of our Statute on class representation. The appellants, Slade, et al, defended the action in good faith and, as far as we can envision, made all possible defenses that anyone could have made: thus, they fulfilled the spirit of the class representation Statute. In 39 Am. Jur. 919, cases from this and other jurisdictions are cited to sustain this statement:

"The doctrine of class representation applies to defendants as well as plaintiffs. In cases where the persons who have a common interest or a common right and who properly should be made parties defendant to an action are too numerous to be conveniently brought into court, equity allows the suit to be brought against one or a few individuals who are in fact the representatives of the larger class."

II. The appellants say: *"The surviving trustee was without authority to make the appointment of the successor trustees and therefore the successor trustees were not the duly qualified and acting trustees on the date the quitclaim deed was delivered."* In the argument on this point, appellants point out that no record has ever

been found of the terms of the original deed made by Warner Brown to the Trustees of the Cemetery and, therefore, there is no showing that the surviving heirs of Warner Brown had the authority to appoint any trustees, as was done by the November, 1892 instrument. Appellants continue their argument by saying that the alleged trustees in 1954 had not been duly appointed as trustees and therefore had no power to make the contract with the Church and convey the 86-foot strip that had been a portion of the Cemetery. It is unfortunate that the original conveyance by Warner Brown to the three trustees was never placed of record, but that is the condition that confronts us in this record. If the three original trustees had no right to appoint successor trustees, then ever since 1892 people have been acting as trustees without authority. But the point is that persons have acted as trustees and that the court of equity in this case has sanctioned such actions.

It is elementary law that a court of equity will appoint trustees in any proper case in order to prevent a failure of the trust. This was recognized by our Court in the early case of *Conway, et al., ex parte,* 4 Ark. 302 (Loc. Cit. 361):

"But even suppose that the ten trustees, who signed the deed, were incompetent to take, still, the other five being competent, a court of equity would not permit the trust to fail; for it is a rule in equity which admits of no exception, that a court of equity never wants a trustee. Whenever a trust is created, either by deed or will, or by operation of law, and no person is appointed trustee, equity will follow the estate, and cause the trust to be executed. If no trustee is named, or he dies, or the trust devolves upon an incompetent person, the trust shall prevail, and the Chancellor will appoint trustees. *White* v. *White, Bro. C. C.* 12, *Atty. Gen'l* v. *Rupin,* 2 Peere Wms. 425, *Ellison* v. *Ellison,* 6 Ves. 663, 2 Story's Equity 241, Co. Lit. 113 a. n. l. *McCarty* v. *Orphan Asylum Society,* 6 Cowen, 337."

Again, in Vaughan v. Shirey, 212 Ark. 935, 208 S. W. 2d 441, we said:

"It is familiar law that equity will not permit a trust to fail through the failure of the named trustee to serve, but will, in that event, appoint another trustee . . . "

When Warner Brown conveyed the cemetery to Trustees in 1848, a trust was created. So, even if W. W. Brown, Jr., Alta Goodwin and Dan Lee Staples were not the duly appointed, qualified and acting Trustees of the Warner Brown Cemetery at the beginning of this suit, they certainly were such after the decree of the Chancery Court in this case, because the decree not only recognized them as the Trustees, but recites: " . . . and their appointment are approved and confirmed; . . ." Thus, the Chancery Court, which at all events had the residual power to appoint trustees, approved and confirmed the appointment of the said Trustees and likewise approved the execution of the deed which they made.

III. The appellants say: *"The trustee grantors named in the deed were without the power or right to execute, acknowledge and deliver said conveyance and in so doing their actions were in violation of the original purposes of the trust and constituted a breach thereof."* This is the most serious question presented by the appeal. If we knew what the original conveyance made by Warner Brown recited, we would know whether the trustees were empowered to make a conveyance of a portion of the property and our question would be answered one way or the other. But, in the absence of such positive information, we have to apply general principles of law. At the outset, we state that what the Trustees did in this case was a very fine, common-sense solution of serious difficulties. In 1848 Warner Brown could hardly have seen that in the next hundred years El Dorado would become an oil metropolis and grow from a town of several hundred people to a large and flourishing city; he could hardly have seen that the little cemetery by the Church would be abandoned for cemetery purposes (the evidence shows that there have been no burials in this cemetery since 1938); and he could hardly have seen that in a hundred years some of the graves would

be obliterated and some of the monuments destroyed by time.

What Warner Brown wanted was the permanent maintenance of the burial places of those whose bodies might be interred in the cemetery. The Cemetery Trustees in 1954, by executing the contract and deed with the Church, have accomplished that evident purpose: for all of the bodies theretofore interred in the 86-foot strip have been removed, and the remaining portion of the cemetery is guaranteed continuous care. A very fine and sensible solution has been made by the Trustees[3]. We find no case exactly in point with the situation here, but equity should be as alert to approve common sense solutions as parties are to make them. In *Renn* v. *Renn*, 207 Ark. 147, 179 S. W. 2d 657, we said:

"A court of conscience must keep the granted relief abreast of the current forms of iniquity. We should never naively refuse relief against fraud simply because there is no similar instance of such fraud in any of the books."

The converse of the quoted statement applies here: a good sensible solution has been made which carries out the evident purpose of Warner Brown; and equity should approve such a solution, even though no case like this one appears in the books.

---

[3] There is a conflict in the cases as to the power to sell cemetery lands for other purposes. In 14 C. J. S. 80 the text says: "The power to alienate cemetery lands is restricted, but the fee of a cemetery may be sold subject to the rights of lot owners." (Here there is no showing that any cemetery lots were ever sold.) Among other cases which sustain the quoted text are: *City of Tacoma* v. *Tacoma Cemetery*, 28 Wash. 238, 68 Pac. 723; *McDonald* v. *Monongahela Cemetery* (Pa.), 75 Atl. 38; and *Laurel Hill Cemetery* v. *Sargent* (Calif.), 238 Pac. 732. Contrary to the above quoted text, there is an Annotation in 130 A. L. R. 250 wherein cases are cited to sustain this text: "Where land has been appropriated for use as a private cemetery, title thereto cannot thereafter be transferred by sale, lease, devise, or descent in any manner so as to affect the rights incident to the Private Cemetery." *A fortiori*, the foregoing text would apply also to public cemeteries. But we do not have to decide in this case which rule is correct, because our decision is based on the doctrine of *cy pres*, which is not considered as a sale but a kindred use of the trust property.

The Trial Court rested its decree on the *Cy Pres* Doctrine; and that seems very reasonable[4]. There is a splendid recent volume entitled "The Cy Pres Doctrine in the United States," written by Edith L. Fisch. It is therein stated that the phrase *"cy pres"* comes from the French expression *"cy pres comme possible,"* which is translated: "as near as possible." Bogert, in "The Law of Trusts and Trustees," Volume 2, A, section 431, says that the *Cy Pres* Doctrine is:

". . . the principle that equity will, when a charity originally or later becomes impossible or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to mould the charitable trust to meet emergencies."

Arkansas, along with twenty-eight other States in the American Union, has approved the *Cy Pres* Doctrine. Here are some of our cases involving it: *State National Bank* v. *Bann,* 202 Ark. 850, 153 S. W. 2d 158; *State ex rel Attorney General* v. *Van Buren School Dist.,* 191 Ark. 1096, 89 S. W. 2d 605; and *McCarroll* v. *Grand Lodge,* 154 Ark. 376, 243 S. W. 870.

In the case of *Bossen* v. *Women's Christian National Library Assn.,* 216 Ark. 334, 225 S. W. 2d 336, we said:

"In 10 Am. Jur. Charities, Sec. 51, it is said: 'The American Law Institute takes the position that the trustee of a charitable trust can properly sell trust property if a power of sale is conferred in specific words, or such sale is necessary or appropriate to enable the trustee to carry out the purposes of the trust, unless such sale is forbidden in specific words by the terms of the trust or it appears from the terms of the trust that the property was to be retained in specie. Even a prohibition against the sale will not prevent the court from authorizing the trustee to make sale, in case of necessity

---

[4] Quite apart from the *Cy Pres* Doctrine, we cite for information purposes an Annotation in 168 A. L. R. 1018, and particularly that portion on page 1031 dealing with charitable trusts.

arising from unforeseen change of circumstances, and to apply the proceeds to the purposes of the trust. Thus, where the circumstances existing at the time of the creation of a charitable trust have changed to such an extent that in order to carry out properly the charitable intention of the donor, it is necessary to dispose of the trust property and devote the funds to the acquisition of a more suitable location, a court of equity will authorize the sale of the property.' See, also, Restatement, Trusts, Vol. 2, Secs. 380, 381 and 399; Bogert, Trusts and Trustees, Vol. 2, Sec. 438.''

We reach the conclusion that the decree of the Chancery Court should be affirmed under the *Cy Pres* Doctrine.

Affirmed.