[No. 5923.  Decided March 17, 1906.]

W. HENDRYX et al., Appellants, v. PEOPLE'S UNITED CHURCH OF SPOKANE, WASHINGTON, et al., Respondents.[1]

RELIGIOUS SOCIETIES — FRAUDULENT EXPULSION — DIVERSION OF PROPERTY—COURTS—JURISDICTION—PARTIES—CAPACITY TO SUE.  The courts have jurisdiction of an action brought by persons claiming to be members of a church, who allege a wrongful and fraudulent attempt to expel them from the society, and a fraudulent diversion of the church property to uses foreign to the purposes of the church, and it is error to dismiss the action for want of capacity to sue upon its appearing that the records of the church show the plaintiffs to have been expelled; since no ecclesiastical question is involved, and equity will protect from a fraudulent or void expulsion, or wrongful diversion of the property.

Appeal from a judgment of the superior court for Spokane county, Carey, J., entered June 15, 1905, upon a finding by the court that the plaintiffs had no capacity to sue, dismissing an action brought on behalf of the members of a church to cancel a deed and for an accounting.  Reversed.

*L. H. Prather,* for appellants.

*Graves & Graves,* and *W. H. Plummer,* for respondents, cited, *inter alia:* Shannon v. Frost, 3 B. Mon. 253; Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666; Nance v. Busby, 91 Tenn. 303, 18 S. W. 874, 15 L. R. A. 801; Bouldin v. Alexander, 15 Wall. 131, 21 L. Ed. 69; Hundley v. Collins, 131 Ala. 234, 32 South. 575, 90 Am. St. 33; Sale v. First Regular Baptist Church, 62 Iowa 26, 17 N. W. 143, 49 Am. Rep. 136; Ingleheart v. Rowe, 20 Ky. Law 821, 47 S. W. 575; Grosvenor v. United Society, 118 Mass. 78; Krecker v. Shirey, 163 Pa. St. 534, 30 Atl. 440, 29 L. R. A. 476; Trustees v. Harris, 73 Conn. 216, 47 Atl. 116, 50 L. R. A. 636; O'Donovan v. Chatard, 97 Ind. 421, 49 Am. Rep. 462; Fitzgerald v. Robinson, 112 Mass. 371; Pounder v. Ashe,

[1]Reported in 84 Pac. 1123.

44 Neb. 672, 63 N. W. 48; *Powers v. Budy,* 45 Neb. 208, 63 N. W. 476; *Herman v. Plummer,* 20 Wash 363, 55 Pac. 315.

DUNBAR, J.—This is an action to cancel a certain deed, purporting to have been made by the People's United Church of Spokane, Washington, to the defendant Thomas Hye, for an accounting with the defendant David N. McInturff, and for the appointment of a receiver for all the property of said church. The substance of the complaint, after alleging that the People's United Church of Spokane, Washington, is a religious corporation, organized for the purpose of maintaining the worship of Almighty God, charitable purposes, and support of the widows of deceased members of said church, the business affairs of which are managed by a board of trustees, and that the church was the owner and in possession of certain real estate and personal property, is to the effect that, about five years ago, the said McInturff, the pastor of said church, and his wife, the defendant Eugenie L. McInturff, conceived the intent of getting possession of all of said property for their own use and benefit, and of selling and trading it off for other property outside of the state of Washington, with fraudulent intent to convert the same to their own use and benefit, and for that purpose they then began, and continuously thereafter pursued, a course of false and fraudulent conduct in their treatment of the members of said church and its board of trustees and its property, by which the said McInturff used his office of pastor and spiritual adviser of said board and members to induce them to allow him to manage the business affairs of said church and its property, representing to them that he could heal them of disease and make them miserable or happy as he wished, and that he would do everything for the benefit of the church; that by such means he gained the confidence of said members and board to such an extent that many of the members and trus-

tees did whatever he requested them to do, and if any one of them showed opposition to his wishes, he peremptorily called pretended meetings of the church and of the board of trustees and by said influence, had them expelled, without accusation, charge, notice, or trial, and had others of his choice and who were willing to do his bidding put in as members of the church and board of trustees in their places; that on the 8th day of February, 1905, the defendants, pretending to act as trustees of said church, but in fact acting under the procurement and instigation of said McInturff in aid of his said fraudulent intent, made, executed and delivered to said defendant Thomas Hye a deed to all of said church's real estate, and a bill of sale of all of said church's personal property in the state of Idaho, for the purpose of there establishing a community colony, which was entirely outside of the purposes of said church corporation, and for the use and benefit of said McInturff; that the said deed was not the deed of said church, and that the said pretended trustees who signed said deed were not at that time trustees of said church, and had no authority from said church to execute said deed; that the defendant Thomas Hye at all times had notice of all the facts hereinbefore set forth; that the said disposition of said church property would destroy said church and leave it no means of support or maintenance; that said McInturff during said times had by his said influence got possession of large sums of money for which he has failed and refused to account; that the plaintiffs were at all times members of said church, and brought this action on behalf of themselves and all other members of said church.

The answer was, in effect, a denial of the allegations of the complaint. At the beginning of the trial, the defendants moved the court to take up and determine, before entering into the trial of any other issue of fact, the question whether or not plaintiffs were members of said church at the time of bringing said action, to which plaintiffs objected because there was no plea in abatement. The court overruled said

objection, to which ruling the plaintiffs excepted, and thereupon the court took up and tried the question of plaintiffs' membership, deciding that they were not members of the church at the time of the commencement of the action, and that they therefore had no interest in the church property and were not competent to bring the action, and the cause was dismissed.

The records of the church were introduced by the respondents, showing that the appellants at a certain time had been expelled. It was the contention of the appellants, and they so testified, that they had not been expelled; that they had had no notice of any trial; that the alleged expulsion was fraudulent and illegal from its inception. From the judgment of dismissal, the appeal is taken.

With the view we take of the merits of the case, it is not necessary to discuss the question of pleadings, raised by the appellants in their first assignment of error, viz., that there not having been any plea in abatement, the question of the membership of the appellants was not put in issue. It is the contention of the appellants that a church corporation cannot expel a member of the church arbitrarily, without charges, notice, or trial, as being opposed to the objects of the corporation and opposed to public policy. In this case the manual introduced in evidence permitted the expulsion of a member without formal trial, but provided that he should be restored to membership on his repentance; and it is contended by the appellants that the two provisions taken together necessarily imply the commission of some offense as the cause of expulsion, else no repentance would be required for restoration. Cases are cited to show that property given or set apart to a church or religious association, for its use and enjoyment and the promulgation of its adopted faith and teachings, is, by said church or association, held in trust for that purpose, and any members of the church or association less than the whole may not divert it therefrom; that the action of one faction in the church in declaring, without notice, hearing, or

evidence, the members of the other faction withdrawn or suspended, will, in a civil action involving property rights, be considered as of no effect.

It is contended by the respondents that, this organization having adopted a creed and made a provision for church government, one of the provisions being that it had power to expel members of the local church with or without formal trial, its action was final; and that, inasmuch as in this country the church and state are divorced, the state shall no more be permitted to interfere with the affairs of the church than will the church be permitted to interfere with the affairs of the state; that the courts will protect the civil rights,. but never when, in order to do so, it is necessary to review, revise, or set aside the action of an ecclesiastical tribunal dealing with matters of church doctrine or discipline; that the court will only go so far as to inquire whether it is a church, and whether the tribunal which has acted is the one endowed with power in the premises by the church; that these questions settled in the affirmative, the courts cannot inquire as to the motives which actuated that tribunal in its action, nor whether it proceeded with the usual legal formalities, or with those prescribed by the laws of the church; that the mere fact of action is conclusive, and that a party who has been expelled from a church organization could not be heard to say in a court of justice that such expulsion was illegal; but that the question of expulsion having been by the rules of the society relegated to the ecclesiastical body, its decision in that respect is final and not reviewable. Many cases are cited to sustain this broad ground, all of which we have examined, and we have also examined many others not cited in the briefs, the question being an important and interesting one. But the three principal cases—the ones upon which all or most of the other decisions hinge—are the cases of *Shannon v. Frost,* 3 B. Mon. (Ky.) 253; *Watson v. Jones,* 13 Wall. 679, 20 L. Ed. 666, and *Nance v. Busby,* 91 Tenn. 303, 18 S. W. 874, 15 L. R. A. 801.

*Shannon v. Frost, supra,* was where two discordant and dislocated parties of a Baptist church in Frankfort, Kentucky, were litigating their respective claims to the house of public worship, erected by the church on ground conveyed years before. In this case, both factions were attempting to use the church, and to deprive the other faction of its use, and the court held that the rights of the parties must depend on the terms and legal effect of the conveyance to the church, on the acts of that church for governing and preserving itself as a distinct Christian society, and on the common law of the land; and that the state court, having no ecclesiastical jurisdiction could not revise or question ordinary acts of church discipline or excision, saying:

"Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. And these we must decide, as we do all other civil controversies brought to this tribunal for ultimate decision. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church; for, whether right or wrong, the act of excommunication must as to the fact of membership, be law to this court."

And it was held that, inasmuch as the conveyance was to the use of the Baptist church, only those who were members of the church at the time of the commencement of the action were interested in the property as a *cestui que trust.* The court further said, in relation to this question:

"Having once associated themselves with many others, as an organized band of professing Christians, they thereby voluntarily subjected themselves to the disciplinary and even expulsive power of that body. The voice of the majority has prevailed against them. They by that fiat, ceased to be members of that association, and with the loss of their membership they have lost all the privileges and legal rights to which, as members, they were ever entitled. Their only remedy now is, therefore, in their own bosoms, in a conscious-

ness of their own *moral* rectitude, and in the consolations of that religious faith and those Christian graces which, under all temporal trials, will ever sustain the faithful Christian and adorn the pathway of his earthly pilgrimage."

*Watson v. Jones, supra,* decided by the supreme court of the United States, Justice Miller speaking for the court, virtually laid down the same rule. In that case the controversy arose in the Presbyterian church, over the question of slavery, and it was held that in cases where the right of property in a civil court is dependent on the question of doctrine, ·discipline, ecclesiastical law, rule or custom, or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it. In this case, as in the ones preceding, the church became divided, each faction claiming that it constituted the true Presbytery and true Synod, each faction claiming that the other had departed from the true teachings of the church and the articles of the faith subscribed to. The court stated that the issues showed that it was a separation of the original church members and officers into two distinct bodies, with distinct members and officers, each claiming to be the true Walnut street Presbyterian church, and denied the right of the other to any such claim. In that case the rule was laid down that, where property had been dedicated to advance certain religious doctrines, it was the duty of the civil courts to see that the property so dedicated was not diverted from the trust which was thus attached to its use; and that so long as there were persons qualified within the meaning of the dedication, and who were also willing to teach the doctrines or principles prescribed in the act of dedication, the courts would prevent the diversion of the property or fund to other and different uses; that a person who built and dedicated a house to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity has a right to expect that the law will prevent that

property from being used as a means of support and dissemination of the Unitarian doctrine and as a place of Unitarian worship. While there are many things said in this case which tend to support the doctrine claimed by the respondents, the announcement just made, it seems to us, clearly supports the appellants' contention in this case. According to the allegations of the complaint, which must be taken as true in this case, the property which was collected and necessarily dedicated by the organization of the church for the purposes expressed in the manual of the church is to be diverted for purposes which are entirely foreign to the objects of the organization. It is conceded by the court in this case that the doctrine of the English courts is that the civil courts would take jurisdiction to determine even ecclesiastical questions; but the court, upon the theory of the divorcement of church and state in this country, took the other view, saying:

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

*Nance v. Busby, supra,* a Tennessee case, was a case arising out of dissensions in the Primitive Baptist church in that state, each faction claiming to be the true church and observing the proper ordinances, the plaintiffs alleging that the defendants had abandoned the celebration of the Lord's Supper; that they had ceased to observe the ordinance of the washing of feet; and alleging various other delinquencies; and it was held there that the court would be bound by the final determination of the ecclesiastical tribunal to which the questions were submitted. In passing upon this question, however, the court said, in speaking of its refusal to take

jurisdiction of the question of whether the excommunications complained of were illegal:

"A different question would be presented if it appeared that *before* such sentence of excommunication the majority had abandoned the faith and practice of the original beneficiaries, and that they had been cut off for adherence to the old ways by such majority, as a mere scheme to better enable them to misapply the property. Such a charge was intimated in the bill. But the verdict of the jury sets at rest every suggestion of heresy or departure from the 'faith and order' of the original organism antecedent to the acts of expulsion complained of."

So that it will readily be seen that the court in that case, under the allegations of the complaint in this case, would have held that the question of the expulsion of the members was a question which the court would take jurisdiction of.

— But, conceding the general rule to be as announced by these cases, yet, if beneath all there was a fraudulent scheme to expel these members for the purpose of wrongfully obtaining control of the property of the organization and diverting it from its original channel, the law will not permit the fraud to be consummated. For, notwithstanding the fact that appellants joined an organization which provided that they might be summarily expelled upon entering the organization, there was an implied obligation or contract that the members would be fairly treated and that good faith would be maintained between them. Church organizations are largely based upon faith—primarily, faith in God and his teachings; secondarily, faith in and reliance upon each other. They are oragnizations which peculiarly call for this reliance. It is the very basis of their existence. It is recommended as a virtue and commanded as a duty, and the constant exercise of faith, charity, and forbearance necessarily makes members of such organizations easy victims for the wily schemer who is willing to don the livery of Heaven to more effectively serve the devil; and they should not be held to too close a knowledge of the arbitrary rules of the society

in relation to the manner of their admission or expulsion, questions ordinarily entirely unthought of and neglected by them in the consideration of the more important subject which moves and induces them at the time of their admission to the church.

It is true that in this country there is what is termed a separation of church and state. The state maintains no church, and absolute individual liberty is granted to every man to worship God according to the dictates of his own conscience, or not to worship Him at all. But it does not follow from this that church property is placed beyond the pale of protection by the law; or that the law will not compel the trutsees of such property to honestly and faithfully carry out the duties of their trust in relation to this kind of property, as well as any other kind. It may be conceded that the courts will not assume to decide purely ecclesiastical questions and substitute their views for the views of ecclesiastical authorities or judicatories, for, as said by Judge Miller in *Waston v. Jones, supra*:

"Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collection of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

But in this case, unlike the one under discussion by the learned judge, there is no ecclesiastical question involved. It is not a question where a schism has arisen in a church, where there is any contention over articles of faith, or the

construction of creeds, or the construction of the Bible, or any of those burning questions which so frequently shake churches to their center—questions which are theological and therefore ecclesiastical, and must of necessity be determined by ecclesiastical authority; but the bald question here is, can a man or set of men, or a majority of the church organization, by chicanery, deceit and fraud, divert the property of a church organization to a purpose entirely foreign to the purposes of the organization, for their own selfish benefit, whether by the expulsion of members or in any other fraudulent manner? Neither the law nor public policy will sustain such a rule. Fraud vitiates all transactions and, if members are expelled for a fraudulent purpose to carry out a fraudulent scheme, the expulsion is a void act, and of no force or effect whatever. Equity will compel fair dealing, disregarding all forms and subterfuges, and looking only to the substance of things.

In this case we think the court erred in denying the right of the appellants to be heard on the questions raised in the complaint. The cause will be reversed, and remanded with instructions to proceed with the trial of the cause.

MOUNT, C. J., HADLEY, FULLERTON, CROW, and ROOT, JJ., concur.