[No. 24702. *En Banc.* February 15, 1934.]

ISABEL E. WILKESON, *Appellant,* v. THE RECTOR, WARDENS AND VESTRY OF ST. LUKE'S PARISH *et al., Respondents.*[1]

[1]Reported in 29 P. (2d) 748.

*John E. Belcher,* for appellant.

*F. A. Latcham,* for respondents.

BLAKE, J.—This is an action for injunctive relief. From a decree favorable to defendants, plaintiff appeals.

At the outset, we are confronted with a motion to strike the statement of facts. The decree was en-

tered and the motion for new trial denied on March 22, 1933. The statement of facts was filed August 12th. The motion to strike the statement of facts is granted. *Graham v. Carroll,* 153 Wash. 222, 279 Pac. 570; *Seattle Natl. Bank v. Trefethen,* 168 Wash. 173, 11 P. (2d) 244.

■ Respondents have also interposed a motion to dismiss the appeal. The contention is that, this being a case of equitable cognizance and triable *de novo* in this court, there is no record upon which it can be so tried, since the statement of facts has been stricken. In support of this contention, respondents cite *Anderson v. McGregor,* 36 Wash. 124, 78 Pac. 776, and *Hannon v. Millichamp,* 40 Wash. 118, 82 Pac. 168. In those cases, the record consisted only of the pleadings and the order or decree appealed from.

In the case at bar, the court made findings of fact and, by reference, made certain exhibits a part of the findings. These exhibits are, therefore, a part of the record. *Keyes v. Ahrenstedt,* 156 Wash. 526, 287 Pac. 35; *Spokane Savings & Loan Society v. Park Vista Improvement Co.,* 160 Wash. 12, 294 Pac. 1028.

It is, of course, unnecessary for the trial court to make findings in a case of equitable cognizance, but in cases where it does, this court will not dismiss the appeal, even though there be no statement of facts, if assignments of error are predicated on the sufficiency of the findings to support the decree.

■ In reviewing the record in such cases, however, this court starts with the presumption that the decree is correct; that it is entitled to every presumption necessary to sustain it, in the absence of an affirmative showing in the finding itself that the necessary facts to sustain it did not exist. *Harbican v. Chamberlin,* 82 Wash. 556, 144 Pac. 717; *Rich v. Kruger,* 130 Wash. 656, 228 Pac. 1012.

The decree will not be reversed, even though the findings may be defective, uncertain or incomplete. *Thompson v. Emerson,* 55 Wash. 138, 104 Pac. 201; *Nelson v. McPhee,* 59 Wash. 103, 109 Pac. 305; *Cook v. Washington-Oregon Corporation,* 84 Wash. 68, 146 Pac. 156, 149 Pac. 325; *Magee v. Risley,* 82 Wash. 178, 143 Pac. 1088; *Rea v. Eslick,* 87 Wash. 125, 151 Pac. 256; *Smith v. Dement Bros. Co.,* 100 Wash. 139, 170 Pac. 555. In the case of *Thompson v. Emerson, supra,* the court said:

"Since no formal findings of fact are necessary to support a decree in equity, it must follow that merely defective or incomplete findings will not render a decree invalid; for surely if the decree is valid without any findings at all, it cannot be in a worse position simply because it is accompanied by defective or incomplete findings. A decree without findings, or defective or incomplete findings, is sustained on the principle that the .proceedings of courts of superior and general jurisdiction are presumed to be regular. In other words, error must appear affirmatively; it is not presumed from any mere defect or omission in matters that are not essential to be shown in order to constitute a valid record. So in the case before us, since it was not necessary that there be findings to support the decree, incomplete or defective findings will not invalidate it."

It is also well settled that, where the statement of facts is stricken, the pleadings will be deemèd amended so as to embrace all the issues upon which the court made findings. *Holden v. Romano,* 61 Wash. 458, 112 Pac. 489; *McCreery v. Carter,* 73 Wash. 394, 131 Pac. 1125; *Wise v. Nichols,* 147 Wash. 375, 266 Pac. 186; *Smith v. Loveland Mutual Co.,* 152 Wash. 545, 278 Pac. 675.

With these principles in mind, we shall now consider the findings made and the decree entered by the

trial court. From the findings the following facts are disclosed: In 1883, Reverend John Adams Paddock was missionary bishop of the Protestant Episcopal Church in Washington territory. February 20th of that year, the Tacoma Land Company conveyed to him lots 1, 2 and 3, block 606, New Tacoma, Washington territory,

". . . in trust nevertheless, for St. Lukes Protestant Episcopal Memorial Church in New Tacoma, Washington Territory and its successors, as such memorial church society, to be occupied by the St. Lukes Protestant Episcopal Memorial Church or Society for Protestant Episcopal Church religious purposes and for no other purpose whatever . . ."

The deed is, by reference, made a part of the findings.

Thereafter, Charles B. Wright erected a stone church edifice on the property, which he gave to the bishop, with the request that it be consecrated as St. Luke's Memorial Church, and that it be considered the bishop's church. The instrument of donation is, by reference, made a part of the finding.

In 1891, the respondent The Rector, Wardens and Vestry of St. Luke's Parish, Tacoma, Washington, was organized as a religious corporation, under the ecclesiastical authority of the Protestant Episcopal Church of the United States of America and of the diocese of Olympia, for the purpose of "maintaining Wright Memorial Church or Chapel." For the sake of brevity, this respondent will be hereafter referred to as St. Luke's.

Prior to 1925, Right Reverend S. Arthur Huston was elected bishop of the diocese of Olympia. He removed the see of the diocese to Seattle. Wright Memorial Church ceasing to be the bishop's church, the respondent St. Luke's requested Bishop Huston to

deed the church to it. This he did September 16, 1925, "impressing thereon the trust contained in the deed from Tacoma Land Company to said John Adams Paddock." It is claimed this deed was defective, in that the grantee was not designated by its correct corporate name. It is clear, however, and the court found, that the intention was to convey to respondent St. Luke's.

In 1926, St. Luke's Parish and Trinity Parish united under the name of Christ Church Parish. This amalgamation was brought about by the majority vote of the members of each parish. The first vestry of Christ Church consisted of the members of the vestries of both the old parishes. The respondent corporation, Christ Church, "was then organized, under the laws of the state of Washington, for the purpose of taking over the properties of Trinity Church and St. Luke's Church."

By reason of its location and greater seating capacity, Trinity Church was selected for the use of the combined congregation. St. Luke's, however, maintained its separate organization. For a time, religious services were continued in the Memorial Church, but finally, due largely to lack of financial support, the church was abandoned for religious purposes; the pews, furniture and memorials being removed and stored.

In the fall of 1932, the building inspector of Tacoma notified Christ Church authorities that the steeple of the Memorial Church was unsafe and likely to fall. Neither St. Luke's nor Christ Church had funds to make necessary repairs, so it was decided to raze the building. To that end, acting under due ecclesiastical authority, the vestries executed a bill of sale to the building to respondent Edward J. Dunn. It is the

purpose of the vestries to sell the real estate also and apply the proceeds on an indebtedness incurred by respondent Christ Church in the erection of a parish house on the Trinity Church property.

When Dunn started to raze the building, appellant, who is a member of St. Luke's Parish, brought this action to enjoin the demolition of the building and for cancellation of the deed from Bishop Huston to St. Luke's. A temporary restraining order was issued. Thereafter, all the respondents, except Bishop Huston, who filed a general denial, joined in one answer, setting up facts upon which they prayed, not only for dissolution of the restraining order, but that Bishop Huston's deed of September 16, 1925, be reformed and confirmed, and that respondent St. Luke's be required to convey the property to Christ Church. By reply, appellant joined issue on the affirmative answer.

Upon the issues thus raised, trial was had, resulting in findings of fact, as herein narrated. By its decree, the court adjudged the right of title to the lots in question to be in respondent Christ Church, in trust; and directed respondent St. Luke's to execute a deed therefor to Christ Church. By the decree, it was further adjudged that Christ Church could sell the property and apply the proceeds to its building fund and to the preservation of "the bell, memorial tablets and all other memorials of St. Luke's." The decree further adjudged that the restraining order be dissolved and appellant's action be dismissed.

To this decree, appellant interposes the following assignments of error:

"(1) The court erred in decreeing the legal title in Christ Church, as such is not supported by its findings.

"(2) The court erred in appointing the vestry of Christ Church trustee and requiring the officers of St. Luke's Church to execute a deed to Christ Church."

Appellant's argument proceeds on the theory that the deed executed by the Tacoma Land Company and the instrument executed by Mr. Wright, donating the church edifice to Bishop Paddock, impressed the property with a trust which prevents its alienation.

With respect to the building, it is clear this contention cannot be sustained, for the deed of gift provides:

". . . I do hereby relinquish all claim to any right of disposing of the said building otherwise than is provided for in the Canons of the Church. . ."

Specific finding was made by the court that the bill of sale for the building to Dunn was executed pursuant to "ecclesiastical authority." Thus it appears that the disposal of the building was within the express terms of the gift. The findings, therefore, affirmatively support the decree, in so far as it dissolves the restraining order.

The *habendum* clause of the deed from the Tacoma Land Company to Bishop Paddock is as follows:

"To have and to hold the said real property hereby conveyed to the said The Right Reverend John Adams Paddock D. D. Missionary Bishop and his several successors as above mentioned in trust as aforesaid so long as the same shall be occupied and used by the said St. Lukes Protestant Episcopal Memorial Church and its Successors as such Memorial Church Society for Protestant Episcopal Church religious purposes aforesaid and no longer."

In considering the effect of the trust thus imposed, there are two well recognized principles of law to be kept in mind: (1) In the absence of fraud, where the right of property in a civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule or custom, or church government, and that has been

decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it. *Hendryx v. People's United Church,* 42 Wash. 336, 84 Pac. 1123, 4 L. R. A. (N. S.) 1154; *Watson v. Jones,* 80 U. S. 679, 20 L. Ed. 666. (2) That

"A majority of a church organization may direct and control church matters, consistently with the particular and general laws of the organization or denomination to which it belongs." 23 R. C. L. 437; *Applequist v. Swedish Evangelical Lutheran Gethsemane Church,* 154 Wash. 351, 282 Pac. 224.

In the light of these rules, what limitations does the above quoted clause in the deed of the Tacoma Land Company to Bishop Paddock place upon alienation of the property? In passing, it may be conceded that, if the purpose of respondents was to divert the funds to be received from the sale of the property to other than religious purposes of the Episcopal Church, the court could and would enjoin them. *Watson v. Jones, supra.* But no such contention is made here.

The deed creates a passive trust. The trustee is merely the holder of the legal title. No active duties are required of him. Under such a trust, the trustee may be compelled to convey to the *cestui que trust.* Bispham, Principles of Equity (10th ed.), § 20; *Trustees for Baptist Church v. Laird,* 10 Del. Ch. 118, 85 Atl. 1082; *McKenzie v. Sumner,* 114 N. C. 425, 19 S. E. 375.

Appellant contends that the members of the religious society of St. Luke's are the *cestuis que trustent,* while respondents contend that the *cestui que trust* is the society itself. On this point, we think it is immaterial which view is adopted. Under either, the appellant is bound by the action of the majority of the congrega-

tion. It will be remembered, in this connection, that the society was incorporated in 1891. In 1926, by majority vote, it elected to unite with Trinity. It undertook to bind itself to convey its property to Christ Church. The latter was organized for that very purpose. While the court made no finding that the amalgamation of St. Luke's and Trinity and the organization of Christ Church was pursuant to ecclesiastical authority, nothing affirmatively appears in the findings to the contrary. It must, therefore, be presumed, in support of the decree, that the evidence showed that there was such authority.

So, whether respondent St. Luke's took title under the deed from Bishop Huston as trustee or as *cestui que trust,* it now holds the title for the benefit of its successor, Christ Church. *Watson v. Jones, supra; Gewin v. Mt. Pilgrim Baptist Church,* 166 Ala. 345, 51 So. 947, 139 Am. St. 41; *Walker v. McPherson,* 199 Ala. 486, 74 So. 449.

It was, therefore, proper, under either view, for the court to direct St. Luke's to convey the property to Christ Church.

Furthermore, since issue was joined on the latter's claim of right to sell the property and apply the proceeds in the furtherance of the religious purposes or principles of the Episcopal faith, it was proper for the court to decree that such right exists. For in a trust of the character here involved, where no restraint is imposed on the right to alienate, the courts will not interfere further than to see to it that the proceeds from the sale of the trust property are not diverted from the use for religious purposes of the faith or denomination to which the property was dedicated. *Watson v. Jones, supra.*

The judgment is affirmed.

MILLARD, MAIN, MITCHELL, and TOLMAN, JJ., concur.

STEINERT, J. (concurring)—I am in accord with the majority opinion, except in so far as it invokes the rule that

". . . where the right of property in a civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule or custom, or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive and be governed by it in its application to the case before it."

In my opinion, no such questions are involved in this case.

BEALS, C. J., concurs with STEINERT, J.

GERAGHTY, J. (concurring)—I concur in the result reached by the majority as the only one possible on the case made. I do not think appellant is in a legal position to maintain the action.

HOLCOMB, J. (dissenting)—There is no law or canon of the Protestant Episcopal Church in question in this matter, but the bishop and standing committee of the diocese of Olympia and the Rector, Wardens and Vestry of St. Luke's Parish in Tacoma simply misconceived the law of the land, and so have the majority in their opinion.

All the texts and cases cited in the majority opinion involve other trusts and uses and other powers of religious associations or corporations. This case involves a sacred trust granted by the donor to the predecessors of the present bishop of the diocese of Olympia and the building of a small but enduring church edifice as a *memorial* to his beloved daughter, then deceased. Too much stress is placed upon part of the language of the dedication and grant, and other language, showing its full intent, is disregarded. The

prevailing opinion accurately states the facts and issues involved herein, but the reasoning and citations of law are all beside the question.

The original conveyance to the Right Reverend John Adams Paddock, Missionary Bishop, and his several successors, prescribes that the land should be held

". . . in trust . . . so long as the same shall be occupied and used by the said St. Luke's Protestant Episcopal Memorial Church and its successors as such Memorial Church Society for Protestant Episcopal Church religious purposes aforesaid and no longer."

The church edifice was built upon the land so donated and dedicated with funds donated by Charles B. Wright, who had procured the conveyance of the land from the Tacoma Land Company, undoubtedly with his own funds, and who intended that, when erected, it not only would be a place for worship according to the doctrines of the Protestant Episcopal Church of the United States and its ministry, but also to stand as a memorial to his deceased daughter, Kate Elizabeth, and to be known as St. Luke's Protestant Episcopal *Memorial* Church. That was its legal and ecclesiastical name; and as such it was accepted, dedicated and consecrated.

Webster defines a "memorial" as "anything intended to preserve the memory of a person or event; something which serves to keep some person or thing in remembrance, as a monument." The deed from Bishop Huston, in 1925, to the Parish of St. Luke's was conditioned that the grantee "by accepting this deed hereby undertakes to conform to the terms of said trust," thus showing that, at that time, both parties considered that there was more to this trust than one held for religious purposes solely.

Unquestionably, it was as a monument that Charles B.

Wright caused the land to be donated and the church edifice erected in memory of his daughter, Kate Elizabeth, not temporarily at the option of the donees and trustee, but perpetually.

It is unfortunate that the congregation, wardens and vestry of St. Luke's church at this time are financially unable to maintain it as a church by supporting a rector and other auxiliaries for conducting services therein. They have, however, no legal right under the law to destroy the building and divert its use as a memorial and monument to Kate Elizabeth Wright. It is encyclopedic law that property held by a religious society, or its officers, in trust for certain specified purposes, must be applied to those purposes. Any diversion thereof is unauthorized unless conferred by statute. 34 Cyc. 1164. There is no such statute in this state.

This is not a case involving merely the power of the majority of a congregation to convey or incumber the real estate as such, as in the *Hendryx* case, or the *Applequist* case, cited by the majority. Nor respecting the power of a subsequently organized corporation to take over the property of a religious society after incorporation, as in the two Alabama cases cited; nor a case involving a division, or schism, in one church and controversies between the two factions as to which was entitled to hold the property, as in the *Watson* case by the United States supreme court, cited. It was there stated that it was a case of a division, or schism, in the church, but it was also there said (p. 723):

"And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use."

This case, when properly interpreted, is contrary to

the theory of the prevailing opinion and of respondents herein.

With due deference to the bishop of the diocese of Olympia, the standing committee of the diocese, and the Rector, Wardens and Vestry of the parish of St. Luke's, it is my opinion that they simply misconceived their duties under this trust, and the Rector, Wardens and Vestry of St. Luke's, together with a majority of its congregation, have a somewhat laudable desire to escape its financial burdens.

Article XXXVII of Articles of Religion of the Protestant Episcopal Church of America, to which the author of this dissent has subscribed, which is a matter of common access and knowledge to all and which speaks for itself, reads:

"The Power of the Civil Magistrate extendeth to all men, as well Clergy as Laity, in all things temporal; but hath no authority in things purely spiritual. And we hold it to be the duty of all men who are professors of the Gospel, to pay respectful obedience to the Civil Authority, regularly and legitimately constituted."

A piece of real estate solidly attached to the soil has been conveyed by a bill of sale, like a portable building, or other chattel, on the land, and like Esau's heritage, sold for a mere "mess of pottage".

With nothing but the kindliest sympathy and consideration for all parties herein, my conscience compels me to dissent from the prevailing opinion for the reasons stated and others less potent.