[No. 74782-2.   En Banc.]
Argued October 19, 2004.   Decided June 9, 2005.

JOYCE NIEMANN, *Petitioner*, v. VAUGHN COMMUNITY CHURCH, *Respondent*.

366

*Douglas V. Alling, Michael E. McAleenan, Jr.*, and *Robert E. Mack* (of *Smith Alling Lane*), for petitioner.

*Thomas F. Peterson* and *Susan K. Goplen* (of *Socius Law Group, P.L.L.C.*) and *Craig A. Robertson* (of *Robertson & Associates*), for respondent.

*George R. Hill* and *Aaron H. Caplan* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 BRIDGE, J.—█ This case requires us to consider whether an alleged restrictive covenant in a deed transferring church property from one church to another prevents the receiving church, Vaughn Community Church (VCC), from selling the original church property in order to relocate to a larger, nearby property. Petitioner Joyce Niemann, a parishioner at VCC, brought suit alleging the restrictive covenant in the deed prevented the proposed sale. The trial court ruled that the conveyance created a charitable trust, then granted VCC equitable relief, removing the alienation restriction from the trust. The Court of Appeals affirmed. We now affirm the grant of equitable relief, thereby modifying the charitable trust and permitting the sale of the church property. We hold the trial court correctly permitted deviation from the administrative trust provision, finding changed circumstances unanticipated by the settlor, and that the requested deviation furthered the charitable trust's primary purpose. Based on this holding, we decline to reach the remainder of the issues raised by the parties as unnecessary to the disposition of the case.[1]

I

¶2 In 1949, the Emmanuel Congregational Church of Vaughn (ECC) owned a parcel of real property located at

---

[1] The trial court additionally invalidated the alleged restrictive covenant, ruling that it impermissibly discriminated on the basis of creed and was thus void under the Washington Law Against Discrimination, RCW 49.60.224. On review, Niemann challenged this ruling and further alleged that the application of RCW 49.60.224, in this case, violated her free exercise of religion. In response, VCC asserted that per *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948), a court injunction enforcing the restrictive covenant would violate its Fourteenth Amendment equal protection rights. We have consistently stated that appellate courts should refrain from addressing constitutional issues unless necessary to the case's disposition. *See State v. Zakel*, 119 Wn.2d 563, 571, 834 P.2d 1046 (1992); *Tommy P. v. Bd. of County Comm'rs*, 97 Wn.2d 385, 391, 645 P.2d 697 (1982). As we completely resolve this case on the equitable grounds before the court, we decline to address these additional issues.

17616 Hall Road, Vaughn, Washington.[2] ECC was a Prot-
estant evangelical church and held services on the property.
Since at least 1899, the property had been continuously
used for evangelical services by a series of churches. In
1949, ECC merged with the Christian Church of Vaughn to
create a new church called the Vaughn Community Church
in Christ (which later changed its name to Vaughn Com-
munity Church, referred to here as VCC). As part of the
merger, the trustees of ECC passed a resolution to transfer
the subject property to VCC with the stipulation that "the
property shall forever remain for the perpetual use of
Protestant Evangelical Churches of the Community of
Vaughn."[3] Clerk's Papers (CP) at 406. While VCC took
possession and began holding services, the land was not
formally deeded at that time.

¶3 In 1956, VCC needed to remodel the church building
on the subject property to meet the needs associated with
its recent growth. In order to obtain a loan to finance the
remodel, on February 22, 1956, ECC formally conveyed the
subject property to VCC by deed. It contained the following
relevant language:

> WHEREAS, on April 5, 1949, the Board of Trustees of [ECC]
> met in regular session and passed a resolution pursuant to the
> authority of the Special Congregation Meeting aforesaid, as
> follows, resolved that
>
> "The Emmanuel Congregational Church of Vaughn transfer
> (the) church property to the Vaughn Community Church of
> Christ, with the stipulation that said property shall forever

---

[2] Vaughn is not an incorporated municipality and is not defined geographically
by any governmental entity except the school district. Clerk's Papers (CP) at 393.
The trial court found that "Vaughn has a broad scope, and on some maps simply
appears in the middle of the [Key P]eninsula as Vaughn . . . without boundaries."
*Id.* at 394.

[3] At around the same time, the former leaders of the Christian Church of
Vaughn sold the church property it formerly occupied and provided VCC with the
proceeds. Most of the leadership of ECC took similar positions with VCC, and
everyone who was previously a member of ECC or the Christian Church of Vaughn
automatically became members of VCC. Petitioner Niemann was a member of the
Christian Church of Vaughn and, following the merger, became a member of VCC.
She was never a member of ECC.

remain for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn"

. . . .

NOW, THEREFORE, in consideration of the premises, [ECC] does, by these presents, convey and quit claim to Vaughn Community Church, a Washington corporation, all its interest in the following described real estate, situate in Pierce County, Washington, to-wit:

[Legal Description of Property]

TO HAVE AND TO HOLD said property for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn, Washington.

Dated this 22nd day of February, 1956.

Pl.'s Ex. 10, at 2-3.

¶4 VCC continued to grow. In fact, the pastor testified that average Sunday services grew from 30 participants in 1956 to approximately 180 participants by 1999. In the early 1980s, VCC was remodeled and expanded to its current condition, including expansion of the sanctuary and addition of a fellowship hall and classrooms. In 1991, only six years after the completion of the remodel, VCC commissioned a feasibility study to explore options for expanding capacity at the current site. The study concluded the current conditions were inadequate and further expansion was not feasible. On March 28, 1999, the majority of those present at the VCC congregational meeting, 79 percent, voted in favor of selling the church property.[4] VCC purchased a parcel of real property approximately 4.3 miles from the subject property and planned to use the proceeds from a sale of the subject property to fund construction of a new church facility.

¶5 In response to this course of events, Niemann brought this action, both in her individual capacity and derivatively, as a member of VCC, to enjoin VCC from selling the church

---

[4] VCC Pastor Charles Odegaard, in a signed declaration, explained that "VCC is now and has always been a congregational church. This means that the government of the church is vested in its members, who exercise the final right of control in all of its affairs." CP at 660.

property to anyone other than a "Protestant Evangelical Church of the Community of Vaughn." CP at 7-13. Specifically, Niemann filed suit in superior court seeking declaratory and injunctive relief to enforce the alleged restrictive covenant in the 1956 deed. In response to separate pretrial motions, Superior Court Judge Kathryn J. Nelson granted partial summary judgment, finding that the conveyance of the church property to VCC in 1956 created a charitable trust and that VCC is a primary beneficiary of the trust, though not the sole beneficiary. Neither party appealed these rulings.

¶6 Following a two-week bench trial, Judge Marywave Van Deren entered final judgment and made specific findings of fact and conclusions of law in favor of VCC. Based on the pretrial ruling that the 1956 deed created a charitable trust, the trial court, without distinguishing between the two, applied the similar yet distinct equitable doctrines of cy pres and equitable deviation to modify its terms and administration. The court sanctioned VCC's request to deviate from the trust terms to allow for the sale of the subject property to finance a new church building to serve the Protestant evangelical community of Vaughn. In addition to this grant of equitable relief, the court ruled that the Washington Law Against Discrimination (WLAD), RCW 49.60.224,[5] prohibited the restrictive covenant found in the habendum clause of the 1956 deed. Specifically, the court held that RCW 49.60.224 applies to charitable trusts and prohibits restraints on alienation of real property on the basis of creed. Secondly, in response to Niemann's argu-

---

[5] RCW 49.60.224 provides:

(1) Every provision in a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, occupancy, or lease thereof to individuals of a specified race, creed, color, sex, national origin, families with children status, or with any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a blind, deaf, or physically disabled person . . . is void.

(2) It is an unfair practice to insert in a written instrument relating to real property a provision that is void under this section or to honor or attempt to honor such a provision in the chain of title.

In addition, RCW 49.60.227 further allows property owners, through an in rem, declaratory judgment action, to remove provisions void under RCW 49.60.224.

ment challenging the constitutionality of the WLAD's application in this case, the trial court held that RCW 49.60.224 does not have a coercive effect on Niemann's practice of religion, that a compelling state interest exists, and that the statute is the least restrictive means of accomplishing that interest. The court further held that the equal protection clause of the Fourteenth Amendment barred it from enforcing the restrictive covenant.

¶7 The Court of Appeals, by a 2-1 majority, affirmed the trial court's rulings with the exception of the equal protection argument, which it declined to reach. *Niemann v. Vaughn Cmty. Church*, 118 Wn. App. 824, 828, 831-32, 77 P.3d 1208 (2003). We granted Niemann's petition for review.

## II

¶8 We begin our analysis by addressing the trial court's grant of equitable relief, permitting modification of the charitable trust.[6]

---

[6] Whether the 1956 deed in fact restricts the alienation of the property at all is questionable. First, a stipulation that the property be *used* for the stated purpose does not, unambiguously at least, prohibit the *sale* of the property and application of the funds to the stated purpose. This is exactly what VCC proposes doing with the property. VCC does not propose using the funds generated by the sale of the property for any unrelated objective. In its pretrial motions, VCC asserted that the deed did not create a charitable trust but rather simply a restrictive covenant. CP at 485-86. But VCC did not appeal the trial court's ruling to the contrary.

In addition, the deed itself may, in fact, merely convey a fee simple absolute outright, with no restrictions. Washington courts do not favor estates upon condition and if the creating language is unclear that a conditional estate was intended, courts will generally construe a fee simple absolute. *See* 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 1.8 (2d ed. 2004) (citing *King County v. Hanson Inv. Co.*, 34 Wn.2d 112, 208 P.2d 113 (1949)). However, neither party has raised nor briefed these issues before this court or the Court of Appeals. RAP 13.7(b) suggests avoiding reaching an issue the parties do not present. While we have departed from this rule on rare occasions, *see, e.g., Mader v. Health Care Authority*, 149 Wn.2d 458, 467-68, 70 P.3d 931 (2003), we have done so only when necessary to "serve the ends of justice" and "secure [a] fair and orderly review." RAP 1.2(c), 7.3. While there is certain doubt as to whether the trial court properly interpreted the deed and its subsequent finding of a charitable trust, we refrain from reviewing these unappealed orders here.

Standard of Review

¶9 The parties present differing views as to the standard of review. Without discussion, Niemann's arguments advocate for us to review the grant of equitable relief de novo. VCC asserts we should apply the abuse of discretion standard. The Court of Appeals, in affirming the equitable relief, agreed with VCC, holding that trial courts have broad discretionary power in fashioning equitable remedies and such action is typically reviewed for abuse of discretion. *Niemann*, 118 Wn. App. at 835 (citing *In re Foreclosure of Liens*, 123 Wn.2d 197, 204, 867 P.2d 605 (1994)). This standard is incorrect.

¶10 While the fashioning of the remedy may be reviewed for abuse of discretion, the question of whether equitable relief is appropriate is a question of law. *See Puget Sound Nat'l Bank of Tacoma v. Easterday*, 56 Wn.2d 937, 943, 350 P.2d 444 (1960) (finding that the question of whether the trial court exceeded its authority in applying cy pres to be a question of law); *cf. Townsend v. Charles Schalkenbach Home for Boys, Inc.*, 33 Wn.2d 255, 205 P.2d 345 (1949).

¶11 The dispute between these parties can best be described as a mixed question of fact and law. While we have previously held that construction of deeds is a matter of law for the court, *see Martin v. City of Seattle*, 111 Wn.2d 727, 732, 765 P.2d 257 (1988), we additionally recognize that the primary objective of deed interpretation is to discern the parties' intent. *See* 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.9 (2d ed. 2004); *see also Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 739, 844 P.2d 1006 (1993) ("A court should construe a deed grant in a manner which gives effect to the intent of the parties. The intent of the parties is to be derived from the entire instrument and, if ambiguity exists, the situation and circumstances of the parties at the time of the grant are to be considered." (footnote omitted)). In other words, "it is a factual question to determine the intent of

the parties" with the court then "apply[ing] the rules of law to determine the legal consequences of that intent." *Veach v. Culp*, 92 Wn.2d 570, 573, 599 P.2d 526 (1979); *see also Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). Applying these principles here, we give deference to the trial court's factual determinations but review the trial court's grant of equitable relief de novo.

### Trial Court's Ascertainment of Settlor's Intent

¶12 On partial summary judgment, the trial court held that the 1956 deed created a charitable trust. CP at 362, 367. While this ruling was not appealed, the parties on appeal dispute the settlor's primary intent in deeding the property to VCC and thereby establishing the charitable trust. The Court of Appeals concluded that substantial evidence supported the trial court's finding that the intent of the settlor was "to benefit the new church, VCC, and to provide for its 'success, growth, and endurance as a church, in ministering and spreading the gospel to the evangelical Protestants of the Vaughn community,' regardless of where the ministries were specifically located." *Niemann*, 118 Wn. App. at 837-38 (quoting CP at 409).

¶13 Niemann correctly asserts that the creation and administration of a charitable trust lies with the settlor's intent. *See generally* 4A AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 351 (4th ed. 1989). But as VCC notes, the instrument which gave rise to the charitable trust here lacks the typical trust language and detail. As such, recognizing the various possible interpretations of the deed language, the trial court correctly found ambiguity existed. Finding ambiguity, the court looked to extrinsic evidence to construe the intent of the settlors. *See Ski Park Farms, Inc.*, 120 Wn.2d at 739. Here, Niemann again challenges the trial court's findings.

¶14 Niemann asserts that the purpose of the trust, based on the settlor's intent, was to maintain "this specific Church Property . . . for the use of the Protestant Evangelical

Churches of Vaughn." Reply Br. of Appellant at 5. She bases her contention on two separate pieces of evidence before the trial court: (1) a 1998 affidavit signed by the two living grantors, and (2) ECC's articles of incorporation prior to merger. In the 1998 affidavit, grantors Harmon Van Slyke, Jr., and Richard Kroger stated that they believed the board of trustees of ECC "intended that the stipulations contained in that deed/indenture be binding and permanent, and prevent any use of said land other than for a Protestant evangelical church in the community of Vaughn." Pl.'s Ex. 42. Additionally, they stated that ECC

> would never [have] granted [the property] if the Board of Trustees ever understood that the Vaughn Community Church, or its successors . . . would have ever considered or acted to sell or gift this real property to a private party for profit making development; and/or any use other than that as a Protestant evangelical church of the community of Vaughn.

*Id.* For Niemann's secondary support she cites the ECC articles of incorporation for the proposition that "[t]he purpose of the [ECC] was to hold real property for 'the promotion of regular and permanent meetings for religious worship in the Town of Vaughn, Pierce County, Washington . . . .' " Reply Br. of Appellant at 6 (quoting Pl.'s Ex. 61).

¶15 With regard to the grantors' 1998 affidavit the trial court considered sufficient and substantial evidence to disregard its application. First, while there is no dispute Kroger was a trustee of ECC in 1949 at the time of the merger, the trial court found it "unclear" as to whether Van Slyke, Jr., was also a trustee. CP at 386. Nevertheless, the court accepted him as one of the grantors of the 1956 deed. At trial, Van Slyke, Jr., maintained that ECC intended the church to remain "in that spot" but he also testified that "the intent of the deed was to transfer the property to the Vaughn Community Church." Report of Proceedings at 254. Also at trial, Kroger apparently denied ever believing the grantors intended a restriction on alienation. He testified that "the intent of the deed restriction was not to preserve a particular piece of land or building. The intent was to

perpetuate a Protestant Evangelical ministry in the Vaughn community and to insure that there was a Protestant Evangelical church available to the people of the Vaughn area." CP at 679. Kroger then testified that he did not know or understand what he was signing in 1998 and that Niemann's attorney actually prepared the affidavit.

¶16 As to the ECC articles of incorporation, Niemann takes the cited statement of purpose out of context. The relevant portion is found in the articles' "Statement of Object and Purpose" and reads, in full:

> The object of this corporation shall be to purchase, lease, receive by gift, legacy, bequest or otherwise, real and personal property wherever situated, *and* to sell, lease, mortgage or otherwise dispose of the same in any and every way that shall be useful to, and assist in, the promotion of the regular and permanent meetings for religious worship in the town of Vaughn, Pierce County, Washington, according to the principles and usages of the Congregational Churches of the United States.

Pl.'s Ex. 61 (emphasis added). Thus, the articles fail to support her contention that the land was to remain and be used in specie.

¶17 The trial court concluded that the grantors had "one overriding and dominant intent in conveying the Subject Property to VCC" and that was "to benefit the new church." CP at 388. Specifically, the court found that "[t]he primary aspect of this purpose was to assist and ensure the continuation of the Protestant evangelical ministries of the Vaughn community *through VCC, regardless of where they were specifically located* and regardless of the name of that church . . . [and] [t]o see that ministry carried on." CP at 388-89 (emphasis added). While the trial court additionally found a specific intent to ensure that the subject property would be available for the Protestant evangelical churches of Vaughn, this purpose was secondary to the grantors' "overriding and dominant" intent. *Id.* Based on the above conflicting evidence, we defer to the trial court's findings of fact regarding the grantors' intent and note only that the

record contains sufficient evidence to support its findings. *See Sunnyside Valley*, 149 Wn.2d at 879-80.

## Cy Pres Versus Equitable Deviation

■■ ¶18 The Court of Appeals upheld the trial court's trust modification applying the doctrines of cy pres and equitable deviation. *Niemann*, 118 Wn. App. at 838-41. The similar objective of these doctrines is to best effectuate the settlor's intent and purpose. While noting some differences in the two doctrines, the Court of Appeals failed to recognize the fundamental distinction. *Id*. at 838-39. The *Restatement (Second) of Trusts* commentary clarifies this distinction by providing that "[t]he rule stated in this Section [regarding equitable deviation] has to do with the powers and duties of the trustees of charitable trusts with respect to the administration of the trust; it has to do with the methods of accomplishing the purposes of the trust." RESTATEMENT (SECOND) OF TRUSTS § 381 cmt. a (1959). It goes on to distinguish it from cy pres:

> The question of the extent to which the court will permit or direct the trustee to apply the trust property to charitable purposes other than the particular charitable purpose designated by the settlor where it is or becomes impossible or illegal or impracticable to carry out the particular purpose involves the doctrine of cy pres. . . .

*Id*. In sum, courts apply equitable deviation to make changes in the manner in which a charitable trust is carried out while courts apply cy pres in situations where trustees seek to modify or redefine the settlor's specific charitable purpose. *Compare Daloia v. Franciscan Health Sys. of Cent. Ohio, Inc.*, 79 Ohio St. 3d 98, 1997 Ohio 402, 679 N.E.2d 1084, 1091-92 (due to change in circumstances, permitted "deviation from the express terms of the trust instruments . . . to carry out the settlors' charitable wishes"), *with In re Trust Known as Spencer Mem'l Fund*, 641 N.W.2d 771, 776 (Iowa 2002) (noting cy pres permits substitution of trust beneficiaries); *see also* GEORGE GLEASON

BOGART & GEORGE TAYLOR BOGART, THE LAW OF TRUSTS AND TRUSTEES § 396 (rev. 2d ed. 1977, repl. vol. 1991); 15 AM. JUR. 2D *Charities* § 155 (2000).

¶19 As there is a singular trust issue before the court, only one doctrine, and not the other, is applicable here. The threshold inquiry therefore is whether the term VCC seeks to modify concerns an "administrative" provision of the trust. VCC, as trustee, does not seek to modify the primary purpose of the trust,[7] apply the funds to an alternative objective, nor substitute beneficiaries. Rather, it hopes to remove the alleged restriction on alienation of the property in order to further the trust's primary purpose. Courts have often classified restrictions on the sale of property as administrative provisions. *See, e.g., Colin McK. Grant Home v. Medlock*, 292 S.C. 466, 349 S.E.2d 655, 656-59 (Ct. App. 1986) (where court discerned *primary* intent of settlors was to provide housing for disadvantaged elderly Presbyterians, court applied deviation to permit sale of land due to declining neighborhood conditions, even though trust required home be located at specific location as a specific monument to one of the settlors).[8] The *Restatement* commentary regarding deviation also supports this view.

> *Where sale of land forbidden by terms of trust.* If a testator devises land for the purpose of maintaining a school or other charitable institution upon the land, and owing to a change of circumstances it becomes impracticable to maintain the institution on the land, the court may direct or permit the trustee to sell the land and devote the proceeds to the erection and maintenance of the institution on other land, even though the testator in specific words directed that the land should not be

---

[7] *See supra* at 376-79.

[8] *See also Trustees of First Presbyterian Church in Newark v. Alling*, 54 N.J. Super. 141, 148 A.2d 510, 514 (1959) (court permits sale of land held in trust for cemetery purposes due to dilapidated condition of property); *Young v. Young*, 255 Mich. 173, 237 N.W. 535, 537 (1931) (sale of trust property authorized in spite of testator's prohibition); *In re John C. Mercer Home for Disabled Clergymen of Presbyterian Faith*, 162 Pa. 232, 29 A. 731, 732-33 (1894) (court permits sale of trust property for benefit of the charity in spite of explicit provisions stating that " 'no part of the said estate . . . shall be sold or disposed of' ").

sold and that the institution should not be maintained in any other place.

RESTATEMENT (SECOND) OF TRUSTS § 381 cmt. e; *accord* RESTATE-MENT (THIRD) OF TRUSTS § 66 cmt. b (2003) ("the provision subject to modification or deviation may be one expressly . . . forbidding the sale of certain properties"); *see also* 2A AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 167, at 287-88 (4th ed. 1987) (in discussing equitable deviation, notes that "[e]ven though the settlor has expressly forbidden what the court permits to be done, the theory is that he would not have forbidden it, but on the contrary would have authorized it if he had known of or anticipated the circumstances"). Based on the above considerations, the application of equitable deviation, and not cy pres, is the appropriate issue for this court's analysis.[9]

## Trust Deviation Principles

¶20 The *Restatement (Second)* standard provides a relatively narrow standard for applying deviation:

---

[9] The doctrine of cy pres is likely inapplicable for a more fundamental reason as well. The Court of Appeals finding that the 1956 deed evidenced a broad, general charitable intent, a prerequisite to the application of cy pres, is questionable. *Niemann*, 118 Wn. App. at 841. In *Horton v. Board of Education of Methodist Protestant Church*, we held that a grantor who provided for a remainder testamentary gift to a university of which he was formerly a trustee, did not evidence a broad charitable intent, but rather a specific gift to a specified institution. 32 Wn.2d 99, 110-12, 201 P.2d 163 (1948). Thus, the doctrine of cy pres was not applicable. *Id.* at 114. That same year, the court in *Townsend* found that the testator, in establishing a home for boys, did not evidence a broad, general charitable intent "but limited his charity to a particular kind of a home for orphaned or abandoned working boys." 33 Wn.2d at 263. In *Townsend*, the court held cy pres could not be applied and thus refused to permit any alteration to the trust. *Id.* Similarly here, the grantors of ECC conveyed the property to VCC for use as a church, a church of which they all became members. It would be difficult to label such a transfer as one evidencing a broad, general charitable intent. On the contrary, akin to *Horton* and *Townsend*, it reflects the grantors' desire and intent to convey a specific parcel of property to a particular institution for a specified and restricted purpose. This is neither broad nor general in scope. However, such a finding has no effect on the consideration and application of the equitable deviation doctrine. *See* BOGART & BOGART, *supra*, § 396, at 313 ("Deviation from the administrative provisions of a charitable trust can be authorized even though the trust possessed a narrow and not a general trust intent, whereas cy pres might not be used in such a case.").

The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.

RESTATEMENT (SECOND) OF TRUSTS § 381, *cited with approval in In re Booker*, 37 Wn. App. 708, 715, 682 P.2d 320 (1984). In *Booker*, the settlor left funds in trust for the construction of a 40-bed rest home in Columbia County. 37 Wn. App. at 709-11. The Court of Appeals applied this standard in permitting the construction of a 30-bed home, in spite of the contrary and specific trust terms. *Id*. at 712-13. In doing so, *Booker* held that a court may permit a trustee to perform acts forbidden by the trust in order to carry out the trust's purpose. *Id*. at 715 (citing RESTATEMENT (SECOND) OF TRUSTS § 381 cmt. d). For a court to allow deviation under this standard, compliance with the trust terms must "defeat" or "substantially impair" the trust's primary purpose.

¶21 The *Restatement*'s most recent rendition of the rule grants courts broader discretion to permit deviation. "The court may modify an administrative or distributive provision of a trust, or direct or permit the trustee to deviate from an administrative or distributive provision, if because of circumstances not anticipated by the settlor the modification or deviation will further the purposes of the trust." RESTATEMENT (THIRD) OF TRUSTS § 66(1). While the first prong of the most recent version is substantially similar to the *Restatement (Second)*, the second prong requires only that "modification or deviation will further the purposes of the trust." *Id*. By requiring a lower threshold finding for equitable relief, this standard gives courts broader discretion in permitting deviation.[10]

---

[10] As the trial court and Court of Appeals both failed to clearly distinguish between cy pres and deviation, they applied an "impracticable" standard in permitting trust modification. *Niemann*, 118 Wn. App. at 839-40. This term is borrowed from the cy pres standard and is not appropriate here.

¶22 The *Restatement (Third)* is consistent with our own case law on trust deviation and reflects our consistent aim of giving effect to the settlor's intent. *Cf. Reagh v. Hamilton*, 194 Wash. 449, 456, 78 P.2d 555 (1938); *Samuel & Jessie Kenney Presbyterian Home v. State*, 174 Wash. 19, 55-59, 24 P.2d 403 (1933); *City of Tacoma v. Tacoma Cemetery*, 28 Wash. 238, 245-47, 68 P. 723 (1902). As such, we adopt it and apply it here.

¶23 Over 80 years ago we held that "[i]n the execution of [trusts in perpetuity] the courts look rather to the intent of the testator than to the method or mode prescribed for its execution." *Samuel & Jessie Kenney Presbyterian Home*, 174 Wash. at 57-58 (upholding accounting methods allegedly contrary to trust instrument's direction). We have also stated that "[w]hile courts, in construing the provisions of a chari-table trust, ordinarily will not deviate from the plan outlined by the testator, they undoubtedly have the power to do so, if it is reasonably necessary in effectuating the *primary* pur-pose of the trust." *Reagh*, 194 Wash. at 456 (upholding trial court's transfer of trust management to a corporation and an increase in number of trustees) (emphasis added) (citing 2 JAIRUS WARE PERRY, A TREATISE ON THE LAW OF TRUSTS AND TRUSTEES § 729a (Raymond C. Baldes ed., 7th ed. 1929)). The court premised its holding on its finding that "the purpose of the trust will best be subserved" and that such alteration "does [not do] violence to the *primary* object of the testator." *Id.* (emphasis added). Thus, recognizing that trust settlors may possess a myriad of intentions in settling a trust, the court must concern itself with their *primary* objective.

¶24 The commentary accompanying the *Restatements* also provides insight into court's application of equitable deviation. It is important to recognize that the objective of equitable deviation is not to disregard the intention of the settlor, but rather to "give effect to what the settlor's intent probably would have been had the circumstances in ques-tion been anticipated." RESTATEMENT (THIRD) OF TRUSTS § 66 cmt. a. Deviation may be allowed with regards to the "provisions governing the management or administration of the trust estate." *Id.* at cmt. b. Both versions contemplate

deviation from express terms either directing or forbidding the sale of certain properties. *See also* RESTATEMENT (SECOND) OF TRUSTS § 381 cmts. d, e.

¶25 The party seeking permission to deviate from the trust terms has the burden of showing either changed circumstances or that relevant circumstances were unknown to the settlor. RESTATEMENT (THIRD) OF TRUSTS § 66 cmt. b. A respondent can then refute this showing. Upon a finding of unanticipated changed circumstances, the court must then determine whether a proposed modification or deviation "would tend to advance (or, instead, possibly detract from) the trust purposes." *Id.*

### III

¶26 Finding equitable deviation rather than cy pres applicable here, we next apply the appropriate standard to discern its permissibility according to the facts of the case. As set forth above, this is decided as a matter of law. *Easterday*, 56 Wn.2d at 943.

¶27 The first prong of the *Restatement (Third) of Trusts*' standard requires a finding of changed, unanticipated circumstances. RESTATEMENT (THIRD) OF TRUSTS § 66. The trial court heard testimony and made several significant factual determinations supporting a finding of present-day material "circumstances not anticipated by the settlor." *Id.* These include significant congregational growth, limitations with the building and property, stricter development and building codes, drastic changes in the "community of Vaughn," including growth, expansion, and relocation of its business core, and finally changes in the attitudes, expectations, and needs of parishioners compared with the 1950s. These findings support the conclusion that present day conditions present "circumstances not anticipated by the settlor[s]" in the maintenance of the church and its service to the Vaughn community.

¶28 Looking to the second prong, as set forth in *Restatement (Third)*, for a court to permit deviation it must

determine that the "deviation will further the purposes of the trust." *Id.* Niemann's contention that the current church location can and is being used for church functions, and thus VCC or another church *could* continue to occupy these premises, fails to directly address the proper legal standard and issue before the court.

¶29 VCC proffered substantial evidence showing the church's mission, and thus the trust's primary purpose, would in fact be substantially impaired by continued habitation of the specific parcel of property. Niemann disputes this finding and points to evidence in the record showing that nothing was physically wrong with the church property and that it could continue to be used as a viable church. When extrinsic evidence allows for conflicting reasonable inferences to be drawn, we generally defer to the trial court's determinations. *See Berg v. Hudesman,* 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990). In response to this, the trial court made several findings of fact, notably:

25. . . . The Court accepts the clear testimony and, therefore, finds that the goal of an evangelical ministry is to spread the gospel at home and more broadly.

26. The Court further finds that growth is an essential and necessary part of a successful evangelical church. The Grantors of the Subject Property, and, indeed the plaintiff and many of plaintiff's witnesses, subscribed to growth being one of the obligations placed upon an evangelical Christian church.

. . . .

28. There are many problems with the building and the property itself which make it impracticable for VCC to carry out its obligations under the Charitable Trust. For example, there are parking problems. . . . [Court goes on in detail regarding limitations of parking.]

29. There are problems with the church building itself . . . [with the current conditions] inadequate and problematic for this church at this site. . . .

. . . .

32. . . . The expectations of these parishioners, and those who make VCC their home church, are different from those of VCC's congregation in the 1940s and 1950s.

CP at 390-92.

¶30 The trial court determined that the settlor's primary intent was to convey the property to VCC, and its primary purpose in doing so was to "ensure VCC's success, growth, and endurance as a church, in ministering and spreading the gospel to the evangelical Protestants of the Vaughn community." CP at 388. The housing of VCC at the specific parcel of property, at the time, may have seemed a necessary means of securing this intent. However, the *primary* trust purpose remained the same: the success of VCC as a church and the spread of the gospel within the community of Vaughn. The trial court made sufficient findings to support its conclusion that permitting deviation was reasonably necessary to effectuate and further the trust's *primary* purpose.[11] Our conclusion in *Easterday* applies equally here: "[t]he only change that has come about by virtue of the trial court's judgment is in the *means* of administering the trust . . . [t]he *purpose* of the trust remains the same." 56 Wn.2d at 950.

¶31 Based on substantial evidence introduced at trial, we now find, as a matter of law, that changed, unanticipated circumstances exist that are material to the trust's purpose, and permitting deviation from the alleged restriction on alienation would in fact further the primary purpose of the trust. As such, the facts of this case permit deviation.

■ ¶32 Turning to the remedy granted by the trial court, we find no error. Trial courts have broad discretionary power in *fashioning* equitable remedies. *See In re Foreclosure of Liens*, 123 Wn.2d 197. There is no evidence the trial court abused its discretion in fashioning its remedy nor that it acted in an arbitrary or capricious manner.[12] *Cf.*

---

[11] *See supra* at 376-79.

[12] The trial court concluded that:

*Easterday*, 56 Wn.2d at 947-48. To the contrary it heard seven days of testimony, heard from 14 witnesses, and considered over 100 pieces of documentary evidence. No abuse of discretion is evident.[13]

## IV

¶33 In conclusion, we affirm the Court of Appeals grant of equitable relief, modifying the charitable trust and permitting the sale of the church property. In so doing, we hold that deviation is permissible when, due to circumstances unanticipated by the settlor, modification of an administrative requirement would advance the trust's purpose. The trial court, as a matter of law, correctly permitted deviation from an administrative trust provision, finding circumstances unanticipated by the settlor and that deviation furthered the charitable trust's primary purpose.

ALEXANDER, C.J.; C. JOHNSON, SANDERS, CHAMBERS, OWENS, and FAIRHURST, JJ.; and IRELAND, J. Pro Tem., concur.

¶34 MADSEN, J. (concurring in part, dissenting in part) — I concur with the majority that Vaughn Community Church (VCC) has the right to sell the church property at issue. However, I would hold that the 1956 deed conveyed a fee simple absolute in the property. The majority's opinion

---

VCC may sell the Subject Property to any person or entity, free of the restriction in the 1956 Deed, to wit: "for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn, Washington." VCC is not required by this judgment to sell the Subject Property. However, if VCC does sell the Subject Property, the proceeds of any such sale shall remain subject to the Charitable Trust, and VCC must use those proceeds to provide a new church facility serving the Protestant evangelical community of Vaughn. VCC must locate any such new church within Pierce County, Washington, south of the Kitsap County boundary, but north of Longbranch, at any place within the width of the Key Peninsula.

CP at 381. The trial court based its deviation on the finding that a "church located in any place on the Key Peninsula can serve the centrally located Vaughn community." CP at 394. Relevant here, the ruling effectively eradicates the alleged restriction in the 1956 deed.

[13] Niemann's additional argument that VCC would be in breach of its fiduciary duty as trustee of a charitable trust if permitted to sell the subject property is rendered moot by this opinion.

affirming the trial court's restrictions on the property violates two fundamental, long-standing principles of law and policy: (1) the free alienation of property and (2) the separation of church and state. Accordingly, I respectfully concur with the majority's result that VCC can sell the property and dissent as to the limitation on use of the proceeds imposed by the trial court.

## ANALYSIS

¶35 Washington, like other states, encourages the free alienation of property. *Richardson v. Danson*, 44 Wn.2d 760, 766, 270 P.2d 802 (1954) ("the law seeks to encourage the ready alienation of property and to discourage restraints upon alienation which would result in withdrawing such property from the ordinary channels of trade"). *See also* 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 1.26, at 50 (2d ed. 2004) ("The underlying policy is that interests in land should be allowed to move freely in commerce."). The trial court's unwarranted stretch to find that the 1956 deed created a charitable trust violates the public policy favoring free alienation, and the majority does it further violence by affirming trial court intervention.

¶36 More alarming, the majority's opinion significantly conflicts with the constitutional prohibition that bars courts from engaging in analysis that entangles the state in private religious matters. *Southside Tabernacle v. Pentecostal Church of God,* 32 Wn. App. 814, 817, 650 P.2d 231 (1982) ("we must first decide on an analysis which does not violate the First Amendment prohibition against a state entangling itself in matters of church doctrine and practice"); *Presbytery of Seattle, Inc. v. Rohrbaugh*, 79 Wn.2d 367, 485 P.2d 615 (1971). *See also* Note, *Judicial Intervention in Disputes Over the Use of Church Property*, 75 HARV. L. REV. 1142, 1142-43 (1962) ("Most religious controversies that culminate in litigation concern the administration of church property. . . . Judicial review of the internal affairs

of churches poses peculiar and delicate problems, involving not only the possible anomaly of judicial interpretation of religious doctrine but also one of the most deeply felt and sensitive policies of the American constitutional scheme—the separation of church and state." (footnotes omitted)).

¶37 In *Southside Tabernacle,* in a dispute over the ownership of property between a local church and its national church, the Court of Appeals sagely warned against courts becoming entangled in matters of church doctrine and practice under the guise of resolving property disputes:

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. . . . But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. . . . "

32 Wn. App. at 817-18 (quoting *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969)).

¶38 In affirming the trial court's decision, the majority not only sanctions the trial court's prior entanglement in the private religious matters of VCC, it all but ensures future court entanglement. Under the trial court's ruling, affirmed by the majority, VCC is restricted both as to the location of a new church and as to the use of all of the proceeds from the sale of the church property. Majority at 386 n.12. The trial court concluded and the majority affirms that,

"if VCC does sell the Subject Property, the proceeds of any such sale shall remain subject to the Charitable Trust, and VCC

must use those proceeds to provide a new church facility serving the Protestant evangelical community of Vaughn. VCC must locate any such new church within Pierce County, Washington, south of the Kitsap County boundary, but north of Longbranch, at any place within the width of the Key Peninsula."

Majority at 386 n.12 (quoting Clerk's Papers (CP) at 381). What happens if the members of VCC decide that some of the proceeds from the sale of the property should be spent on missionary work or if they find property that would be better suited for a new church outside of the boundaries set by the trial court? What happens if VCC determines that a portion of the proceeds from the sale of the property should be spent to send its youth to a youth bible camp that is not located on church property? Under the majority's view, VCC would be obligated to return to court to ask permission for such a "deviation," notwithstanding the fact that under its governmental structure, VCC has the authority to take such action if approved by a majority of the members.

¶39 This case can be readily resolved without government involvement in religious matters, involvement that the facts and the law do not justify in any event. Unfortunately, however, the majority concludes, "[w]hile there is certain doubt as to whether the trial court properly interpreted the deed and its subsequent finding of a charitable trust, we refrain from reviewing these unappealed orders here." Majority at 373 n.6. Instead, the court should exercise its inherent review authority.

¶40 While ordinarily we will decide a case only on the basis of issues raised in the petition for review and the answer, RAP 13.7(b), this court has the authority to determine whether a matter is properly before the court, to perform those acts which are proper to secure fair and orderly review, and to waive the rules of appellate procedure when necessary to "serve the ends of justice." RAP 1.2(c), 7.3; *see Mader v. Health Care Auth.*, 149 Wn.2d 458, 467-68, 70 P.3d 931 (2003); *State v. Aho*, 137 Wn.2d 736,

740-41, 975 P.2d 512 (1999); *Kruse v. Hemp*, 121 Wn.2d 715, 721, 853 P.2d 1373 (1993). The issue of whether the deed created a charitable trust was fully briefed by the parties for the trial court and, therefore, deciding this issue will prejudice neither party.[14] In fact, justice demands that this court review the issue.

## I. Church/State Entanglement

¶41 A two week bench trial was held in this case because the trial court erroneously found that a "trust" was created by the 1956 deed. Accordingly, it was necessary for the trial court to determine the purpose of the trust and whether the current circumstances justified VCC's decision to sell its property and build a new church.

¶42 The parties submitted numerous exhibits and provided lengthy testimony. Over 50 years of documentation was submitted detailing all aspects of the church's activities. *See, e.g.*, Exs. 6-7, 11-16, 18-19, 21-23, 22-38, 60, 120. For example, membership reports detailed the number of active members for each year, the number of new members received by baptism and by letter, and the number of members lost during the year. *See, e.g.*, Exs. 6-7, 11. Yearly attendance numbers noting the members' attendance at Sunday School, Morning Worship, Sunday Evening Worship, Youth and Prayer Attendance, Ladies Bible Study, and Vacation Bible School were produced. *Id.* Over 50 years of pastor reports were submitted providing the total number of calls made by the pastor to homes in the community, the number of sermons delivered, the number of walks through the valley of the shadows with families, the number of special services attended outside of Vaughn, the number of marriages occurring at the church, and the number of conferences and classes attended. *See, e.g.*, Ex. 13.

¶43 Additionally, the record contains reports by the Board of Trustees describing 50 years of yearly mainte-

---

[14] *See Aho*, 137 Wn.2d at 741; *Falk v. Keene Corp.*, 113 Wn.2d 645, 659, 782 P.2d 974 (1989); *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 430, 759 P.2d 427 (1988).

nance and upkeep of the church building and property each year. *Id.* Treasury reports and annual budgets submitted provide the yearly expenditures for various church expenses such as salary, custodian, missions, bank loan, insurance, office supplies, heat, electricity, pension, and education. *Id.*

¶44 The pastor also discussed the composition and needs of its music ministry and VCC's rich history of providing mission help both at home and abroad. *Id.* VCC currently supports missionaries in such places as Brazil, Turkey, Uzbekistan, and Central Asia. CP at 662-63. VCC supports orphan care in the Ukraine and staff at an eye hospital in Pakistan. *Id.* VCC also helps to build houses and churches in Mexico and supports the training of missionaries for future work in Africa. *Id.*

¶45 The trial court's findings included the following:

24. Since the time period when the Christian Church and [the Emmanuel Congregational Church of Vaughn (ECC)] merged and the Subject Property was conveyed to VCC, VCC's attendance has grown substantially. Between 1982 and 1985, VCC was remodeled and expanded to its current condition. The remodeling included expanding the sanctuary, adding a fellowship hall, adding classrooms, bathrooms and office space. During the expansion the number of attendees at church grew significantly. Although VCC's attendance peaked in the 1980's, it is again approaching those levels. The Subject Property is approximately 1.6 acres in size. The sanctuary has 185 seats. The building is 9,512 square feet. The current parking area could be reconfigured and striped to hold up to 77 cars.

25. Allowing VCC to expand to meet the goals of a modern evangelical church is consistent with sound administration of the trust corpus. The testimony made clear that VCC could continue to use the Subject Property in its current condition, or with some modifications, but in doing so its members only continue to experience frustration at their inability to attract and serve the growing number of members in the community of Vaughn as well as the Key Peninsula area as a whole. The Court accepts the clear testimony and, therefore, finds that the goal of an evangelical ministry is to spread the gospel at home and more broadly.

26. The Court further finds that growth is an essential and necessary part of a successful evangelical church. The Grantors of the Subject Property, and, indeed, the plaintiff and many of plaintiff's witnesses, subscribed to growth as being one of the obligations placed upon an evangelical Christian church.

27. With respect to the Subject Property's suitability to serve the needs of VCC in effecting the purpose of the Charitable Trust, the Court finds that the trustee, VCC, and its congregation, have determined that it is impracticable to effect the purpose of the Charitable Trust on the Subject Property.

28. There are many problems with the building and the property itself which make it impracticable for VCC to carry out its obligations under the Charitable Trust. For example, there are parking problems. There is a greater demand for parking today, than there was 50 years ago (and even 20 years ago) due to societal changes. There are more cars per household now, and in some households every member of the family drives a car. This Court takes judicial notice of the fact circumstances were different in 1949 and for several decades thereafter. Whether there are two or a dozen parking spots left outside this church on any particular Sunday morning during services does not mean there is not a parking problem. Parking needs to be of a nature where one can feel like there is free access to come and go to the property. Double parking in rows does not alleviate parking problems.

29. There are problems with the church building itself. The building must be practical and of a size reasonably sufficient for use in the present format of a church. Restroom space must be adequate and accessible to the disabled. Classrooms must be accessible and adequate for the members of the Church and those to whom the Church is trying to reach and minister. Seating availability and arrangements in the church sanctuary must be suitable for families to come and sit together. Activities for youth and children must be able to be accommodated. Circulation patterns within the church facilities must be safe, efficient, and inviting. The Court finds that all of these conditions are inadequate and problematic for this church at this site, thereby making it impracticable for use as a modern church.

30. There are stricter development regulations than those in force at the time of this conveyance. There are stricter sewage

disposal requirements now. Fire codes have changed. There has also been an increase in the value and acquisition cost of adjoining and nearby properties, which, if acquired, could potentially alleviate some of the problems associated with the impracticability of the Subject Property. These reasons further illustrate the impracticability of remodeling or adding-on to the existing church buildings in light of the limitations inherent in the Subject Property related to its size and location. Thus, VCC must relocate and does not have the adequate funds to build the desired church facilities elsewhere without first selling the property currently held in trust.

. . . .

32. There are other circumstances which make the Subject Property impracticable for a modern church (which is what the present congregation of VCC has indicated it wants). The expectations of these parishioners, and those who would make VCC their home church, are different from those of VCC's congregation in the 1940s and 1950s. Churches function in vastly different ways from churches 50 years ago, when there was a more informal assistance network and fewer single parent families with limited income, no transportation, and no safety net. The role the church plays in today's society has changed.

33. Moreover, there has been a proliferation of new churches in the Key Peninsula area, altering the expectations of parishioners that they place upon their home church and impacting their choice of a home church.

34. Thus, this Court finds that what was suitable for the continued use of a church as recently as the 1980s is different now. VCC as trustee of this charitable trust must deal with today's issues if it is to remain viable. VCC cannot be expected to satisfy today's needs in providing a Protestant evangelical ministry to the community of Vaughn with limitations imposed in the 1950s or even the 1980s. These circumstances, in the year 2002, make the continued and permanent use of this facility, which has been remodeled twice since 1949, impracticable for use as a modern church.

CP at 390-92.

¶46 This breathtaking intrusion into the activities, belief and mission of the church and its members was neces-

sary to justify deviation from the trust unnecessarily created by the trial court. Instead of rejecting this intrusion and unnecessary exercise, the majority's opinion encourages this invasion and discourages the free alienation of the church's property as intended by the 1956 deed.

## II. Free Alienation of Property

¶47 By statute and by law, conveyances of fee simple absolute, the largest estates, are favored. *Richardson*, 44 Wn.2d 760; 17 STOEBUCK & WEAVER, *supra*, § 1.3, at 5. Accordingly, "in order to make an estate conditional, the words used in the deed must clearly indicate such an intent." *King County v. Hanson Inv. Co.*, 34 Wn.2d 112, 119, 208 P.2d 113 (1949). It is well settled that "[b]efore a trust will be found to exist, there must be a clear manifestation thereof." *Hoffman v. Tieton View Cmty. Methodist Episcopal Church*, 33 Wn.2d 716, 726, 207 P.2d 699 (1949). The evidence to establish a trust must be clear and satisfactory. *Id.* (citing *Kinney v. McCall*, 57 Wash. 545, 107 P. 385 (1910); *Lanigan v. Miles*, 102 Wash. 82, 172 P. 894 (1918)). This means that the instrument manifests an intention to create a trust. *Id.*

¶48 In *Hoffman*, a local church argued that a trust relationship was created by a lease of property on which a church had built a parsonage. In analyzing the lease to ascertain whether a trust relationship was created, the court set out the following principles:

> The entire instrument and its general purpose and scope may, and where necessary should, be considered, and its various parts compared. The instrument should be construed in the light of the situation and circumstances surrounding its execution.

*Id.* at 726 (citing 54 AM. JUR. § 53, at 63, 63).

¶49 In language similar to that of the deed in this case, under the terms of the lease in *Hoffman*, the property at issue was " 'never [to] be used for any other than church, charity, literary or community purposes.' " *Id.* at 724. The

court rejected the church's theory that this language created a trust, finding that the "instrument was an ordinary short-form lease, for a term of years with a nominal rental. It contained the usual covenants for use and occupancy, with a provision for re-entry on breach of the covenants." *Id.* at 727. The court concluded that the instrument was a lease and not a trust instrument, entered into primarily for the purpose of providing ground for the erection of a parsonage for a minister of the Methodist Episcopal Church, thereafter to be assigned to the local church. *Id.*

¶50 In this case, taking all of the provisions of the deed into consideration, as well as the circumstances surrounding the conveyance of the church property in 1956, there is nothing to suggest that the parties intended to convey this property subject to a trust. As in *Hoffman,* the instrument contains no language common in trust agreements. Rather, evaluating the language of the deed in this case there can be no doubt that, similar to the earlier 1914 deed, the 1956 deed conveyed to VCC all property interests held by ECC—a fee simple absolute.

¶51 The granting clause provides:

> NOW, THEREFORE, in consideration of the premises, the Party of the First Part does, by these presents, convey and *quit claim* to Vaughn Community Church, a Washington corporation, all its interest in the following described real estate, situate in Pierce County, Washington, to-wit:
>
> [legal description of the property]

Ex. 92 (emphasis added). Significantly, the granting clause did not convey and quit claim the property "in trust" to VCC. Rather, it conveyed and quit claimed the property directly to VCC. When transferring property by "quit claim," the conveyance is affected by a quit claim deed. *See, e.g.,* 17 STOEBUCK & WEAVER, *supra,* § 7.2, at 472 (a quit claim deed transfers all legal and equitable rights the grantor may have in the described land). It is also undisputed that prior to the conveyance, ECC, like all prior churches in custody of the property, held the property in fee simple

absolute, free of any trust, restriction, or limitation. *See, e.g.*, Exs. 88-93.

¶52 The only possible language that could potentially indicate a trust, "to have and to hold for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn, Washington" in the habendum clause must be read in the context of the rest of the document. The recitals provided that ECC, a Protestant Evangelical Church in Vaughn, voted to merge with the Christian Church of Vaughn, the other Protestant Evangelical Church in Vaughn. The church property was to be used (and in fact was used for over six years prior to the conveyance in 1956) by two formerly independent Protestant Evangelical Churches operating in Vaughn. When entities combine and merge, all property interests held by the prior entities are transferred to the new entity, a successor in interest to the prior entity or entities. *See, e.g.*, RCW 24.03.210(4) (providing in part that a surviving or new corporation shall possess all property of each merging or consolidating corporation, without further act or deed); *Wilkenson v. Rector, Wardens & Vestry of St. Luke's Parish of Tacoma*, 176 Wash. 377, 29 P.2d 748 (1934) (determining that it was proper for the lower court to direct a conveyance of property to a new church that resulted from the merger of two churches).

¶53 It is well settled that courts do not "reach" to find trusts when circumstances do not justify the need for a trust. For example, in *Young Women's Christian Ass'n of Asheville, North Carolina, Inc. v. Morgan*, 281 N.C. 485, 189 S.E.2d 169 (1972), a testator conveyed property to the Young Women's Christian Association (YWCA), a charitable corporation, by will for the purpose of maintaining the Moorhead House, a facility supported by the YWCA. In reaching its conclusion that the will did not create a trust, the court noted that a trust was not necessary because the bequest was for the principal purpose set forth in the YWCA's charter. Thus, the YWCA, as a charitable organization governed by state law, was already obligated to carry out the purpose of the bequest. As a result, the YWCA held

the bequest in fee without a trust. *Accord Zabel v. Stewart*, 153 Kan. 272, 109 P.2d 177, 178-81 (1941) (the provisions of a bequest to a religious corporation "for the purpose of building a church building" and "for the purpose of furnishing said church" did not create a trust in any legal sense because the gift was to aid the religious corporation in carrying out the purposes for which it was founded); *Williams v. Thompson*, 216 N.C. 292, 4 S.E.2d 609 (1939) (the language in the will indicating that the property was to be used as a parsonage for the minister of the church and to keeping and care, cannot be held to have the effect of impressing a trust upon the legal title).

¶54 In this case, taking all of the provisions of the deed into consideration, it is clear that the deed did not create a trust, and there is no reason whatsoever for the court to "reach" to find a trust. As discussed above, the conveyance of this property was pursuant to a merger of two churches. ECC did not convey the property under a will in which failure to find a trust would result in intestacy or the property not being conveyed to a charity. VCC is a charitable organization created and organized for the very purpose of providing church services in the community of Vaughn. *See, e.g.*, Ex. 5 (containing VCC's articles of incorporation).

¶55 As I conclude that the deed did not create a charitable trust, the next step is to determine the type of property interest conveyed. The construction of deeds is a matter of law for the courts. *Martin v. City of Seattle*, 111 Wn.2d 727, 765 P.2d 257 (1988). If the words and provisions in the deed are doubtful, they are to be taken most strongly against the grantor. *Cook v. Hensler*, 57 Wash. 392, 107 P. 178 (1910). If the words and provisions are susceptible of different constructions, the court may take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted at the time of making the grant, for the purpose of ascertaining the probable intent. *Cook*, 57 Wash. at 399.

¶56 Turning to this deed, the granting clause provides that ECC does "convey and quit claim to [VCC] all its interest in the following described real estate, situate in Pierce County, Washington," the church property. Exs. 10, 92. As discussed above, this deed conveys all legal and equitable rights and interests the grantor may have in the described land. 17 STOEBUCK & WEAVER, *supra*, § 7.2, at 472. The granting clause does not contain any limitation or condition indicating that ECC retains any rights in the property. Read alone, the granting clause indicates that VCC received all of ECC's interest (a fee simple absolute interest) in the property. As mentioned earlier, it is undisputed that prior to the transfer, ECC owned the property in fee simple absolute. *See, e.g.*, Exs. 88-93.

¶57 The recital clauses and the habendum clause are consistent with the granting clause's conveyance of a fee simple absolute interest in the property. One recital clause provided that ECC voted to merge with the Christian Church of Vaughn and form a new church. When an entity merges into another entity or two entities create a new entity, all property interests owned by the prior corporations are conveyed in full. *See, e.g.*, RCW 24.03.210(4); *Wilkenson*, 176 Wash. 377.

¶58 The habendum clause provides VCC has the property "[to have and to hold] said property for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn, Washington." Exs. 10, 92. A separate recital clause provides that on April 5, 1949, the Board of Trustees of ECC passed a resolution that "[ECC] transfer the church property to [VCC], with the stipulation that said property shall forever remain for the perpetual use of Protestant Evangelical Churches of the Community of Vaughn." *Id.* The term "perpetual" indicates permanent ownership. Neither the habendum clause nor the recital provide for a right of reversion in the event VCC does not use the property for Protestant Evangelical Churches of the Community of Vaughn, Washington. Indeed, in the context of a merger, a reversion makes no sense. After the merger, ECC no longer

exists. Its members have all become members of the new church. Most of its trustees have become trustees in the new church.

¶59 The deed is a standard quit claim deed in which ECC transferred all of its property interest, a fee simple absolute property interest, in the property to VCC, the successor entity to ECC. This conclusion effectuates the intent of the deed in its entirety. It also accords with the principle that free alienation of property is favored and that unless a deed clearly indicates conveyance of a conditional estate, a fee simple absolute is conveyed.

¶60 Furthermore, the deed does not create a restrictive covenant limiting VCC's use of the property. Early in the litigation, Niemann argued that the habendum clause created a running covenant limiting VCC's use of the property. Niemann later abandoned this reasoning, conceding that it would be legally impossible for ECC to create a restrictive covenant. CP at 97 (citing 17 STOEBUCK & WEAVER, *supra*, § 3.2, at 125). I agree. In this case, ECC could not have created a restrictive covenant on its own land. *See, e.g.*, 17 STOEBUCK & WEAVER, *supra*, § 3.2 ("A landowner cannot by himself place a running covenant on his own land, for the same reason that one cannot make a contract with himself or create an easement on his own land."); § 3.3, at 131; § 3.12, at 151 (restrictive covenants must "touch and concern" the land, needing both a benefited and a burdened parcel); *accord* WILLIAM B. STOEBUCK & DALE A. WHITMAN, THE LAW OF PROPERTY § 8.15, at 475-80; § 8.24, at 495-97 (3d ed. 2000); *1515-1519 Lakeview Blvd. Condo. Ass'n v. Apartment Sales Corp.*, 146 Wn.2d 194, 43 P.3d 1233 (2002). Accordingly, the deed conveyed a fee simple absolute interest in the property to VCC.

¶61 I would remand this case to the trial court for entry of judgment for VCC.